UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
SARAH DIKRANIS,

                Plaintiff,                                    **COMPLAINT**

              -against-                                      Jury Trial Demanded

NASSAU HEALTH CARE CORPORATION
d/b/a NUHEALTH  and ELIZABETH FLYNN,

                Defendants.
-------------------------------------------------------------------X

Plaintiff, Sarah Dikranis, by and through her attorneys, LEEDS BROWN LAW, P.C., complaining of Defendants herein, alleges upon knowledge as to herself and her own actions, and upon information and belief as to all other matters, as follows:

## JURISDICTION AND VENUE

1. This action is brought pursuant to the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, *et seq.*, and any other cause of action which can be inferred from the facts set forth herein.

2. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, 28 U.S.C. §1343(a)(3), 28 U.S.C. § 1343(a)(4).

3. Venue is proper pursuant to 28 U.S.C. § 1391.

4. All conditions precedent to maintaining this action have been fulfilled.  On December 28, 2021, a complaint was filed with the New York State Division of Human Rights ("NYSDHR"), which was dual-filed with the Equal Employment Opportunity Commission ("EEOC").  On September 28, 2022, the EEOC issued a right to sue letter. This action was properly instituted within 90 days of the receipt of said letter.

1

## PARTIES

5. Plaintiff, Sarah Dikranis ("Sarah") is a working mother of three young children. Sarah was and still is a resident of Suffolk County, New York.

6. Defendant, Nassau Health Care Corporation d/b/a NuHealth, which is also known as Nassau University Medical Center ("NUMC"), is a public teaching hospital. NUMC is organized as a New York state public benefit corporation under the name Nassau Health Care Corporation.

7. Defendant, Elizabeth Flynn ("Flynn") is NUMC's Rehabilitation Director. As Rehabilitation Director, Flynn has final authority to assign work responsibilities, bring disciplinary charges, transfer employees, and set policies. Accordingly, she is a supervisor under the applicable laws. Further, she is an employer under the applicable State Laws. Flynn was aware of and remained deliberately indifferent to the unlawful conduct as set forth herein. .

## FACTUAL BACKGROUND

8. On June 11, 2018, Sarah was hired by NUMC as a part-time Level I Occupational Therapist. In this role, Sarah's direct supervisor was Flynn.

9. At all relevant times, Sarah performed her job duties in an exemplary manner, and received favorable performance reviews.

10. Within months of Sarah's hire, Flynn began promising future opportunities of full-time employment. Each time the subject was raised, Sarah indicated her interest.

11. In January 2021, Sarah became pregnant with her third child. Sarah did not disclose her

pregnancy at this time as she wanted to wait until the 20th week, at which time she would have completed a bio-physical profile that would determine whether she was carrying a healthy child.[1]

12. In April 2021, a full-time Level I Occupational Therapist became available in Sarah's department.

13. Between April 16-23, 2021, Elizabeth Flynn (Supervisor) offered Jessica Schelin (part-time Level I Occupational Therapist) the full-time position. Schelin was unmarried, had no children, and had substantially less experience than Sarah, both at NUMC and generally.

14. On April 23, 2021, Schelin declined the full-time position. Flynn then asked Sarah if she was interested in the full-time position via text message. Sarah replied in the affirmative, noting that she had long desired a full-time position.

15. On May 5, 2021, Sarah met with Flynn to discuss the full-time position. Sarah told Flynn that she was very interested, but needed to discuss the matter with her husband to ensure they could coordinate childcare, and could get Flynn a firm answer the next day.

16. On May 6, 2021, Sarah told Flynn that she would gladly accept the full-time position. Flynn told Sarah she was surprised, given Sarah's childcare responsibilities. Flynn told Sarah she would speak with HR to begin the hiring process, and that she would update Sarah later that day.

---

[1] This was of particular concern to Sarah, as her second child has developmental delays.

17. Sarah did not receive an update from Flynn by the end of her shift.  Thus, Sarah emailed Flynn:

> Hi Liz,
>
> Here are my stats for April. I also wanted to send you and email with the schedule just in case you need to reference it.
>
> I can start full time the week of June 7th. At that time I can work Wed, Thur, Fri, Sat, & Sunday.
>
> Starting in September all of my daughter's therapy will hopefully take place at school and I can work Sun, Mon, Tue, Wed, Thur. If you need me to start this schedule sooner, I can work on making arrangements.
>
> Thank you so much again for the opportunity! I am very excited!"

18. Sarah received no response to this email.

19. On several occasions over the next few weeks, Sarah asked Flynn for status updates. Flynn vaguely alluded to discussions she would need to have with HR, but did not provide any firm responses.

20. On May 24, 2021, Sarah had a bio-physical profile performed, revealing that she was carrying a healthy child.

21. On May 25, 2021, Sarah applied for a Civil Service examination so that she would be on the Civil Service list, in case it was necessary for her to obtain the full-time position. Sarah took this step proactively, as another employee had previously advised her that Flynn may use the Civil Service list as an excuse not to make Sarah full-time.  Sarah advised Flynn that she had applied, who stated that she would still need to speak with HR.

4

22. On May 26, 2021, Sarah told Flynn she was pregnant, with an anticipated birth date in October. Flynn appeared surprised, but congratulated Sarah before quickly rushing off to a meeting.

23. On May 27, 2021, Sarah met with Flynn to provide Flynn with paperwork regarding her annual performance evaluation. Flynn told Sarah she wanted revisit the issue of the full-time position. Flynn asked Sarah intrusive questions about her pregnancy and childcare plans, and questioned whether Sarah was able to work full-time. Flynn told Sarah that, "Three kids is a lot," and implied she had been tricked by asking whether Sarah knew she was pregnant when she accepted the position. Flynn also asked Sarah how much maternity leave she expected to take. Sarah told Flynn that she did not know, but she took 12 weeks with her first child and 10 weeks with her second. Flynn replied, with words to the effect of, "Well you only came back to work part-time, full-time is a lot, are you sure you can handle this?" Sarah noted that the difference between full and part-time was only one additional day, which she knew she could handle. Flynn then attempted to persuade Sarah to remain in her part-time role, and later seek full-time status after another employee retired at some point in the future. Sarah stated that she was sure she could handle a full-time position now, noting there were not guarantees of another full-time position opening up in the immediate future. Flynn then reluctantly stated, "Well I guess if you want the job now, it is yours."

24. On June 9 or 10, 2021, during a department meeting, Flynn discussed the department's staffing issues, noting that a new full-time position had been created, and another may soon be created. Flynn did not mention that she offered the position to Sarah, who accepted. After the meeting, Flynn told Sarah she was still waiting to hear from HR

5

about the position, and would keep her posted.

25. On June 11, 2022, Civil Service notified NUMC that it could convert Sarah to full-time status, without the need for Sarah to sit for the Civil Service Exam.

26. On June 16, 2021, while 23 weeks pregnant, Sarah was involved in a serious car accident. Before Sarah was taken by ambulance to the hospital, Sarah left Flynn a voicemail, advising her of the accident, that she would be absent from work, and would provide updates when she knew more. Thereafter, Sarah was diagnosed with multiple herniated discs, requiring physical therapy and other medical treatment.

27. On June 25, 2021, Sarah's physician provided her with a letter stating she could return to work with lifting restrictions on June 30, 2021. Sarah provided Flynn with a copy of this letter. Flynn told Sarah she could not return to work until she had no restrictions.

28. On June 26, 2021, Sarah received a Civil service exam score of 90, and was officially placed on the Civil Service list.

29. On July 1, 2021, during a party held for two departing employees, Flynn reviewed the schedule with members of the department. Flynn stated that she planned to eliminate Sunday therapy for the foreseeable future due to Sarah's absence. Flynn discussed the details regarding Sarah's injuries with the department,[2] and further stated that she believed it was "pointless" for Sarah to return to work until after her pregnancy.

30. On July 6, 2021, Sarah was advised by her physician that he expected that she could return to work without restrictions on July 22, 2021. Sarah texted this information to

---

[2] This was a HIPAA violation.

6

Flynn, with copies of notes indicating same. Flynn did not respond.

31. On July 22, 2021, Sarah's physician provided her with a letter stating she could return to work without restrictions on July 22, 2021. Sarah provided this note directly to NUMC's employee health department. NUMC then cleared Sarah to return to work on July 28, 2021 (her next scheduled workday).

32. On July 22, 2021, Sarah provided Flynn with her return to work forms. At this time, Flynn advised Sarah that she had hired someone else for the full-time position due to Sarah's absence, and also because she was unable to reach Sarah on the Civil Service list (i.e., Sarah's score of 90 was not high enough). Sarah asked if the new hire had started work. Flynn replied that the new hire would not start work until August 22, 2021. Sarah stated that she had already accepted the position, and that she could begin working full-time as early as July 28, 2021. Flynn curtly stated that Sarah could not accept a full-time position, then go out on FMLA leave for a pregnancy in October. Sarah then asked about the second full-time position that Flynn had mentioned at the party. Flynn said that it would most likely become available in the fall, and that it was just "bad timing" for Sarah.

33. On July 26, 2021, Sarah spoke with Cathy Dargaotti (HR Manager) regarding maternity leave. Dargaotti told Sarah that as of that date, Sarah had worked 1,042 hours, and that to qualify for FMLA leave, which would guarantee her job upon her return to work, Sarah would be required to have worked at least 1,250 hours. If Sarah did not qualify for FMLA leave, her only option would be non-FMLA leave. Unlike FMLA leave, non-FMLA leave did not guarantee that Sarah would be able to return to work at the end of

the leave period, and the decision would be at the discretion of Sarah's supervisor. At this time, Dargaotti further advised Sarah that if she began her non-FMLA leave on September 30, 2021, the latest return to work date would be December 6, 2021, but that Sarah could then apply for childcare leave to extend her return to work date through the end of February.

34. On July 29, 2021, Flynn offered Sarah the second full-time position that they had previously discussed. Sarah accepted, and Flynn promised to coordinate with HR. Later that day, Flynn texted Sarah, stating that Sarah must complete corporate compliance paperwork in connection with her switch to full-time status.

35. On July 30, 2021, Sarah completed the corporate compliance paperwork. As Sarah dropped off the paperwork, she witnessed Flynn conducting a job interview, which, upon information and belief, was for the position she had already offered to Sarah.

36. On August 8, 2021, Sarah emailed Flynn, asking for an update on the full-time position, and noting she was available to start as soon as possible. Flynn did not respond.

37. On August 22, 2021, Arlett Baily, the employee Flynn hired for the first full-time position, began work. Sarah was assigned to train Baily. During the training, Baily told Sarah she had scored a 90 on the Civil Service Exam, thus indicating Flynn's claim that she could not reach Sarah on the Civil Service list was untrue. Despite Baily's full-time status, she did not work again until August 29, 2021, as NUMC accommodated her need to finish her contract with her prior employer.

38. On August 25, 2021, Sarah applied for maternity leave. On this date, Sarah had not

accrued enough hours to qualify for FMLA leave. Had Sarah been given the full-time position she was promised before Flynn discovered she was pregnant or within a reasonable amount of time thereafter, Sarah would have worked enough hours to qualify for FMLA leave.

39. On September 9, 2021, Sarah was approved for non-FMLA leave, effective September 30, 2021, with a return to work date of December 6, 2021. This leave was unpaid. Notably, Sarah qualified for Paid Family Leave under New York State law,[3] but this was not provided.

40. On September 9, 2021, after it was apparent to Flynn that Sarah had not accrued enough hours to qualify for FMLA leave, Flynn told Sarah that she could begin completing paperwork with HR in connection with the second full-time position. Sarah complied, and was switched to full-time status, effective September 26, 2021 - just four days before Sarah's maternity leave was to commence.

41. Had Sarah been given full-time status in June 2021, when she was approved by Civil Service, she would have had three months of work as a full-time employee. In that time, she would have accrued 1,250 hours for the year, which would have qualified her for FMLA leave and held her job for up to one year of leave. Accordingly, a jury could infer that Respondents delayed promoting Sarah because she was pregnant, in a deliberate attempt to preclude her from taking FMLA leave, and to allow Respondents to hire an employee in Sarah's place who was not pregnant.

---

[3] Employees who work a regular schedule of less than 20 hours per week are eligible after working 175 days, which do not need to be consecutive.

42. At the end of the September 30, 2021 workday, Sarah began her non-FMLA maternity leave.

43. On October 7, 2021, Sarah gave birth to her third child via C-section.

44. On December 1, 2021, Flynn texted Sarah, inquiring about her return to work and noting HR had indicated a return date of December 6, 2021.

45. On December 2, 2021, Sarah applied for childcare leave. That same day, Sarah replied to Flynn's text, stating, "Good morning I have been in touch with HR and have submitted an application for childcare leave which is an extension to maternity leave. I request to return to work on 2/28 instead of 12/6. However I never had a plan to return 12/6 we always discussed January as my time to return." Flynn did not respond.

46. On December 2, 2021, Cathy Dragotti (Personnel Officer) advised Sarah that her application for childcare leave was denied because Sarah had not accrued enough work hours,[4] and that she must return to work on December 6, 2021. Sarah told Dragotti that returning to work on December 6, 2021 would be impractical, as she was caring for an infant. Dragotti asked Sarah for her job title, and Sarah replied that she was an occupational therapist. Dragotti replied, "Well you can get a better job just about anywhere." Sarah told Dragotti this was not a solution, and that she just wanted to push back her start date, further noting that Eileen Barbagallo, a part-time occupation therapist who was close with Flynn was permitted to take leave from March 2020 through February 2021. Dragotti promised to look into the matter further, but never contacted

---

[4] Had the first full-time position not been rescinded due to Sarah's pregnancy, Sarah would have exceeded this work hour requirement.

10

Sarah again.

47. At this time, Sarah continued to be qualified for Paid Family Leave under New York State law, as it was not previously taken. Moreover, Sarah been given the full-time position she was promised before Flynn discovered she was pregnant or within a reasonable amount of time thereafter, Sarah would have worked enough hours to qualify for FMLA leave, which would have afforded her the opportunity to resume work on the latter date.

48. On December 2, 2021, Flynn angrily told Sarah that she would not be discussing any other employee's leave situations. Flynn told Sarah that if she did not return to work on December 6, 2021, she had to either resign or accept a demotion to part-time status.

49. By letter dated December 9, 2021, but received by Sarah on December 15, Dragotti advised Sarah that she has not returned and does not have a medical note supporting a need to be out and she was directed to return to work by December 16, 2021 or they will take action "up to and including termination."

50. On December 20, 2021, Sarah was terminated. The person NUMC hired to replace Sarah was not scheduled to begin work until March 7, 2022, and that start date was pushed back by at least a week. Thus, had NUMC not withdrawn their previous offer of full-time employment, such that Sarah would have accrued enough hours to qualify for FMLA and thus been able to return to work on February 28, 2021 (or, alternatively, allowed Sarah to return to work on that date to accommodate her reasonable childcare needs), Sarah still would have returned to work before the start date of her replacement.

## CLAIMS FOR RELIEF

### First Set of Claims

### (Title VII – Discrimination and Retaliation)

51. As set forth above, NUMC subjected Sarah to adverse actions and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq, on the basis of her gender, pregnancy, pregnancy-related conditions, and her opposition to discriminatory practices.

### Second Set of Claims

### (FMLA – Interference and Retaliation)

52. As set forth above, NUMC manipulated Sarah's work hours to avoid its responsibilities under the Family and Medical Leave Act ("FMLA"), and used Sarah's request for FMLA leave as a negative factor in employment actions, thus violating 29 U.S.C.S. § 2601 et seq.

### Third Set of Claims

### Discrimination Based on Gender and Retaliation – (Fourteenth Amendment as enforced by 42 U.S.C. § 1983)

53. The Individual Defendant, under color of state law, altered Plaintiff's terms, conditions and privileges of employment because of her gender, in violation of the Fourteenth Amendment of the United States Constitution (as enforced by 42 U.S.C. § 1983) by subjecting her to discriminatory and retaliatory adverse actions.

WHEREFORE, Plaintiff demands judgment against Defendants, for all compensatory, emotional, physical, and punitive damages (where applicable), lost pay, front pay, and any other damages permitted by law. It is further requested that this Court grant reasonable attorneys' fees and the costs and disbursements of this action and any other relief to which Plaintiff is entitled. Plaintiff demands a trial by jury.

Dated: Carle Place, New York
October 26, 2022

LEEDS BROWN LAW, P.C.
*Attorneys for Plaintiff*
One Old Country Road, Suite 347
Carle Place, N.Y. 11514
(516) 873-9550

_____/s_____
RICK OSTROVE
BRANDON OKANO
