**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Sarah Dikranis,<br><br>Plaintiff,<br><br>-v-<br><br>Nassau Health Care Corporation, *doing business as NuHealth*, and Elizabeth Flynn,<br><br>Defendants. | 2:22-cv-06501 (NJC) (AYS) |

**OPINION AND ORDER**

NUSRAT J. CHOUDHURY, United States District Judge:

Plaintiff Sarah Dikranis brings this action against her former employer, Nassau Health Care Corporation, also known as Nassau University Medical Center ("NUMC"), as well as her former supervisor, Elizabeth Flynn, alleging that the termination of her employment and other employment-related actions constituted pregnancy discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), as amended by the Pregnancy Discrimination Act of 1978 (the "PDA"), 42 U.S.C. § 2000e(k), and the Equal Protection Clause of the Fourteenth Amendment. (Compl., ECF No. 1.)

Before the Court is NUMC's Motion for Summary Judgment ("Motion") under Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). (Mot., ECF No. 30.) For the reasons set forth below, the motion is granted in its entirety.

## FACTUAL BACKGROUND

### I. Dikranis Joins NUMC

Sarah Dikranis began working for NUMC as a part-time occupational therapist on June 11, 2018. (Dikranis Hiring Documents, ECF No. 30-7.) Dikranis was pregnant with her second child at the time of her interview and when she was hired. (Dikranis Tr. at 23.) According to Dikranis, her pregnancy was not visually apparent at either time. (*Id*. at 23; ECF No. 30-39.) She was interviewed by Elizabeth Flynn, who oversees NUMC physical therapist and occupational therapist employees, including the scheduling of shifts and hiring. (Flynn Tr. at 5, 9.) After her hire, Dikranis worked approximately 20 hours per week for NUMC. (Dikranis Tr. at 112.)

### II. Dikranis' First Maternity Leave

Beginning around four months after she began working for NUMC, Dikranis took non-FMLA maternity leave for the birth of her second child from October 7, 2018, until January 6, 2019. (Dikranis Tr. at 41.)[1] Dikranis gave birth via cesarean section, which entitled her to eight weeks of medical leave. (*Id*. at 34–35.) Flynn approved Dikranis' request for four weeks of medical leave on top of eight weeks of maternity leave. (*Id*. at 35, 41.)

On January 2, 2019, NUMC informed Dikranis that she would need a note from her doctor clearing her to return to full duty with no lifting restrictions. (Dikranis Tr. at 42; Jan. 2, 2019 Email to Dikranis, ECF No. 30-8.) Dikranis returned to work on January 6, 2019. (Dikranis Tr. at 41.) She continued to work as an occupational therapist at NUMC on a part-time basis in 2019 and 2020. (*Id*. at 43–47.)

---

[1] Dikranis was not eligible for maternity leave under the Family and Medical Leave Act of 1993 ("FMLA") because she had just started working at NUMC several months earlier. Dikranis Tr. at 34; 29 U.S.C. § 2611(2)(A)(ii) (eligibility for FMLA leave requires the employee to have worked "at least 1,250 hours of service . . . during the previous 12–month period.").

### III. A Full-Time Occupational Therapist Position Becomes Available

NUMC fills open positions by selecting candidates from the Civil Service list, which is compiled by the Nassau County Civil Service Commission (the "Commission"). (Flynn Tr. at 8.) The Commission provides a list of eligible candidates to NUMC Human Resources, which "canvasses" the candidates on the list by sending them letters inquiring about their interest in an open position. (*See id*.) Prospective candidates may submit letters indicating their interest. (Flynn Tr. at 8, 20; Bowen Tr. at 8.) NUMC may also fill an open full-time position by obtaining approval from the Commission to convert an existing part-time employee to a full-time employee. (Bowen Tr. at 27–28.)

In around March or April 2021, one of NUMC's full-time occupational therapists informed Flynn that he would leave NUMC in around May 2021. (Flynn Tr. at 16.) On April 16, 2021, Flynn texted Jessica Schelin,[2] a part-time occupational therapist, to inquire whether she was on the Civil Service list. (Flynn Tr. at 24–29; Dikranis Tr. at 50; Schelin Decl. ¶¶ 4–6.) Schelin was unmarried, had no children, and had less experience than Dikranis as an occupational therapist and less experience working at NUMC than Dikranis. (Dikranis Tr. at 49–50; Schelin Decl. ¶¶ 6–8.)

About one week later, on around April 23, 2021, Flynn informed Schelin that a full-time position would become available soon and asked whether she was interested, to which Schelin replied that she would consider the opportunity. (Schelin Decl. ¶ 4.) That same day, Flynn texted Dikranis to ask if she would be interested in a full-time position. (April 23, 2021 text messages,

[2] Schelin changed her name to Jessica Fatsis upon marriage. Accordingly, exhibits that reference either "Jessica Fatsis" or "Jessica Schelin" refer to the same individual. (*See* Schelin Decl., ECF No. 30-33.)

ECF No. 30-10 at 2.) Dikranis responded that she was interested and asked about the details, including salary, time off, and benefits. (*Id.*) Flynn asked Dikranis if she was on the Civil Service list and instructed Dikranis to ensure that she was on it. (*Id*. at 3.)

On May 6, 2021, Dikranis met with Flynn to discuss details relating to the full-time occupational therapist position. (Dikranis Tr. at 143–44.) The following day, Dikranis told Flynn that she accepted the full-time position. (*Id*. at 144.) That same day, Schelin informed Flynn that she was not interested in the position due to her plans to attend graduate school. (Flynn Tr. at 24–29; Schelin Decl. ¶¶ 4–5.)

On May 17, 2021, Flynn emailed NUMC HR about converting Dikranis from a part-time employee to a full-time employee. (May 2021 emails, ECF No. 30-11; *see also* Bowen Tr. at 27–28.) On May 24, 2021, Flynn followed up with Kasi Bowen, the head of NUMC's Human Resources Department, about the conversion of Dikranis from a part-time to full-time employee and wrote, "Please let me know about this. I don't want to lose this employee." (ECF No. 30-11.)

On May 26, 2021, Dikranis informed Flynn that she was pregnant. (Dikranis Tr. at 145.) According to Dikranis, Flynn "looked surprised, congratulated me and went off quickly to [a] meeting." (*Id.*) On the following day, May 27, 2021, Flynn and Dikranis met for Dikranis' annual performance evaluation. (*Id.*) During that conversation, Flynn made several comments and asked Dikranis questions about her pregnancy, including:

- "[T]hree kids is a lot . . . I myself have three children";
- "[F]ull-time is a big commitment . . . ";
- "[D]id you know you were pregnant when you accepted the job?"
- "Who is going to take care of the new baby?"
- "How much time are you going to take on maternity leave?"

(*Id*. at 145–46.) Flynn also told Dikranis that she "really did not want [her] to feel pressured to take this job with three children" and suggested that Dikranis wait until the retirement of Carol Chamoff, another occupational therapist, to take Chamoff's full-time position. (*Id*. at 146.) Dikranis asked if Flynn had confirmation in writing that Chamoff was retiring in the next six months. (*Id*. at 147.) At that point, according to Dikranis, Flynn became "angry" and told her, "[W]ell, I guess if you want the job it's yours." (*Id*.)

On June 10, 2021, Flynn announced at a staff meeting that a full-time occupational therapist position had been approved, but did not announce that Dikranis had accepted the position. (Dikranis Tr. at 88; Dikranis Decl. ¶ 7.) After the meeting, Flynn told Dikranis that she was still waiting to hear from Human Resources about converting her to a full-time employee. (Dikranis Decl. ¶ 7.)

On June 11, 2021, Rochelle Baum, who worked in NUMC Human Resources, emailed Bowen to confirm that Dikranis could be converted to a full-time position and noted, "[J]ust need a start date and employee needs to stop in to see me." (ECF No. 30-12.) In deposition, Bowen testified that the process of converting a part-time employee to a full-time position proceeds as follows: "[Dikranis] would be called up to human resources at the start of a pay period . . . She would do paperwork to resign the part-time title to accept the full-time title." (Bowen Tr. at 31.) Dikranis does not address these facts, and no evidence in the record calls them into question.[3]

---

[3] Rather, Dikranis ignores the substance of Bowen's testimony and instead asserts, without support and in a conclusory fashion, that the June 11, 2021 email from Baum to Bowen "confirms that Sarah was 100% cleared to be converted to fulltime by 12:18 p.m. on June 11, 2021," referring to the time stamp on Baum's email, and that "[t]here is no explanation as to why she was not converted to full-time on that date." (Pl.'s 56.1 Resp. ¶ 41.) Dikranis simply fails to address Bowen's testimony and thereby fails to raise any genuine dispute as to whether Dikranis was required to complete Human Resources paperwork in order to resign her part-time position

Bowen also testified that NUMC procedure was to not "make any changes while somebody is on a leave. We . . . don't move them up or down. We don't change their department. That's our procedure here. . . . It's not uncommon for somebody to go on a leave and not return to work. So we keep looking to see in case the person doesn't return, is there someone else we can hire." (*Id*. at 32.) Bowen explained that the procedure was not written, but rather, an established practice:

> Q. Okay. So when you say that you don't change someone's status while they're on a leave and that's the policy, is that a written policy?
> A. No, it's a procedure.
> Q. Is that a written procedure?
> A. No procedures are written.
> Q. Okay. So who -- when was that procedure created?
> A. Before I started here in 2010. . . . It's been since we were in the county. That's how they proceed here.
> Q. How do you know that that's the procedure if it's not in writing somewhere?
> A. Well, I was told when I started that that's how it worked. I have observed that multiple times over a variety of different reasons.

(*Id*. at 32–33.) Dikranis disputes the existence of a NUMC procedure by which an employee's status as part-time versus full-time is not changed while the employee is on leave in light of the fact that it is not a written policy and is not set forth in the Civil Service Law or any collective bargaining agreement applicable to Dikranis. (Pl.'s 56.1 Resp. ¶ 57.)

## IV. Dikranis' Injury and Medical Leave

Just days after Baum's June 11, 2021 email to Bowen confirming that Dikranis would be moved from part-time to full-time, Dikranis was involved in a car accident and suffered neck and lower back pain from herniated disks. (Dikranis Tr. at 79.) At the time, she was 23 weeks

---

and to accept the full-time position in order for her employment to be converted from part time to full time.

pregnant. (*Id*. at 76.) As a result of her injuries, Dikranis took unpaid medical leave from June 16, 2021, to July 28, 2021. (*Id*. at 79.)

Dikranis sought to return to work on June 30, 2021, on the basis that her doctor granted her permission to return to work on that date with a restriction to lift no more than 30 pounds. (*Id*. at 80–81.) Dikranis testified in deposition that "some of the patients we lift are very heavy, they require full-max [assistance]" which can require up to "75% of their body weight they're unable to support on their own," and that "[o]bviously 30 pounds doesn't cut it." (*Id*. at 80.) Dikranis further explained that NUMC has "an outpatient rehab department which does not require lifting," and that she was "hoping to get moved to that spot" so that she could return to work on June 30, 2021. (*Id*. at 80–81.) The record does not show that Dikranis specifically requested a transfer. Rather, on or around June 25, 2021, Dikranis texted Flynn, "Hi Liz just got home from the dr. He said I can come back Wed I just need to be careful with lifting . . . ." (ECF No. 30-51 at 1; Opp'n at 4.) Dikranis sent Flynn a signed doctor's note indicating that Dikranis could return to work with a restriction to lift no more than 30 pounds. (ECF No. 30-51 at 1.) Flynn responded, "You cannot come back with that letter. You can only work if there are no limitations. Sorry HR won't accept it." (*Id*. at 3–4.) As of the date of the June 25, 2021 text conversation between Dikranis and Flynn, it was unknown when Dikranis would be cleared to return to work without lifting restrictions. (Dikranis Tr. at 84–85.)

That same day, on June 25, 2021, while Dikranis was still on medical leave without a date for return without any restrictions, NUMC HR sent out a canvas letter to gauge candidate interest in a full-time occupational therapist position. (*Id*. at 90, 98; June 25, 2021 Canvas Letter, ECF No. 30-13.) On July 1, 2021, Arlett Bailey responded with a letter of interest. (ECF No. 30-

13.) Kasi Bowen of NUMC Human Resources testified that once individuals respond to a canvas letter,

> the résumés are sent to the [occupational therapist] department. They do their interviewing. Then when they want to hire someone, they let, usually, Josephine Anello know. And then she reaches out to do -- start preemployment processing. A person comes and does an application. They have to do a preemployment physical. And then we would schedule a start date.

(Bowen Tr. at 37.) In around April or May 2021, Bailey had visited NUMC for a tour and interviewed with Flynn. (Bailey Tr. at 14–16, 23.) During that conversation, Flynn told Bailey that she would need to be on the Civil Service list to be hired at NUMC, that there were no positions available at that time, and that Bailey would be waiting for a position. (*Id.*)

At some point in July 2021, NUMC hired Bailey for the full-time occupational therapist role while Dikranis was still on medical leave. (Flynn Tr. at 60.) Dikranis disputes this fact, yet in her Rule 56.1 Counterstatement, she asserts in three different places that Bailey was hired on July 20 or 21, 2021:

- Paragraph 53: "*On July 21, 2021*, Flynn announced to the entire OT department that she hired Bailey" and that "Bailey completed her physical on July 26, 2021 . . . ." (Pl.'s 56.1 Resp. ¶ 53 (emphasis added))

- Paragraph 54: "Flynn did not announce Bailey's hire *until July 21, 2021*." (*Id.* ¶ 54 (emphasis added).)

- Paragraph 58: "First, Bailey was hired *on July 20, 2022, only two days before Sarah was cleared to return without restrictions* to the role she already accepted. . . ." (*Id.* ¶ 58 (emphasis added).)

However, Dikranis did not communicate to Flynn a certain date by which she would return to work without restrictions until *July 22, 2021*, when she texted Flynn that she was cleared to return to work without any restrictions. (Dikranis Tr. at 102–103.) Thus, accepting Dikranis' own factual assertions as true, NUMC hired Bailey while Dikranis was on medical leave and did

so *before* July 22, 2021, when Dikranis first provided a date of return to work without restrictions.

The sources on which Dikranis relies in an attempt to dispute the fact that Bailey was hired when Dikranis was on medical leave do not support her position. Flynn testified that she hired Bailey sometime in July 2021 off the Civil Service list because:

> the list was expiring; it had to be back by July something. I don't know the date offhand. It's like July 6th the letters came back. And if you don't pull somebody from the list, then the list expires and it has to go back to Civil Service. You have to wait. You request it again and it just prolongs it for, I don't know, it prolongs the whole process.

(Flynn Tr. at 60–61.) While Flynn did not provide an exact date on which NUMC hired Bailey, she testified, "I do recall the list was expiring, so we pulled Arlett[] so that we could get somebody on board." (*Id*. at 63.) Bailey herself testified in deposition that she had a phone call with Flynn on July 21, 2021, although she could not recall the substance of the conversation. (Bailey Tr. at 16–17.) On July 23, 2021, Bailey went to NUMC in-person and completed the required Human Resources paperwork to assume a full-time position. (*Id.* at 25–30; *see* July 23, 2021 Application, ECF No. 30-71.) On July 26, 2021, Bailey completed the physical that was required before the selection of a start date. (Bailey Tr. at 29–30; Bowen Tr. at 37 (explaining that a physical is required before an employee can be scheduled with a start date).) Bailey was hired with a start date of August 22, 2021, which was later pushed to August 29, 2021, due to a personal family tragedy. (*Id*. at 33–36; Bailey August 2021 Time Sheet, ECF No. 30-56.)

Dikranis returned to NUMC as a part-time occupational therapist on July 28, 2021. (Dikranis Tr. at 107–109.)

## V. A Second Full-Time Occupational Therapist Position Becomes Available

On around August 23, 2021, another full-time occupational therapist position became available at NUMC. (ECF No. 30-57.) On September 9, 2021, Flynn offered the position to

Dikranis, and she accepted. (Dikranis Tr. at 122, 188.) During their conversation, Flynn told Dikranis, "I know this is really bad timing, but the second job came through," referring to the fact that Dikranis was scheduled to go on maternity leave in several weeks. (*Id*. at 188.) According to Dikranis, when she accepted the position, Flynn appeared "surprise[d]" and "made a bit of a grimace," and told her that she would speak to Human Resources. (*Id*. at 189.) On September 15, 2021, Flynn instructed Dikranis to visit Rochelle Baum in Human Resources to complete the paperwork required for the full-time position, which Dikranis completed on September 22, 2021, eight days before the start of her maternity leave. (*Id*. at 122–24.)

On September 9, 2021, Dikranis was approved to take maternity leave, in the form of non-FMLA[4] medical leave, from September 30, 2021, to December 6, 2021. (Sept. 9, 2021 Non-FMLA Medical Leave Approval Form, ECF No. 30-16.) Dikranis attempts to dispute that she was scheduled to return to work at NUMC on December 6, 2021. (*See* Pl.'s 56.1 Resp. ¶ 80.) She relies on her deposition testimony that she began maternity leave on September 30, 2021, and expected to return in around February 2022. (Dikranis Tr. at 141–43.) Dikranis further testified that prior to the start of her maternity leave, Cathy Dragotti from Human Resources provided her a copy of the Child Care Leave Application form and said that she could submit the form to request an extension of her maternity leave. (*Id*. at 142.) However, Dikranis identifies no evidence raising a genuine dispute of material fact as to whether NUMC ever approved any request to extend her leave. She did not testify that NUMC approved her request for an extension of time to return from maternity leave. Although she relies on the Non-FMLA Approval Form

[4] Dikranis did not qualify for FMLA leave because she had not accumulated the required 1,250 hours worked in the year before the commencement of parental leave. While Dikranis initially disputed the fact that she was not qualified to take FMLA leave, she conceded this fact at the September 23, 2025 oral argument. (Hr'g Tr. at 28–29; Dikranis Tr. at 28.)

documenting the authorization of her maternity leave in opposing Defendants' summary judgment motion, this document identifies December 6, 2021 as her date of return from leave. (*See* Sept. 9, 2021 Non-FMLA Medical Leave Approval Form, ECF No. 30-40.) The record includes a copy of Dikranis' personal calendar, which does not indicate any return date in the months covered by the calendar, which end in January 2022. (Dikranis Calendar, ECF No. 30-62.) Thus, Dikranis fails to identify any evidence showing that NUMC approved her to return from maternity leave any time after December 6, 2021.

Dikranis began working as a full-time occupational therapist at NUMC on September 26, 2021—just four days before starting her second maternity leave on September 30, 2021. (Dikranis Tr. at 124.) As a full-time employee, Dikranis was required to work 37.5 hours per week. (*Id*. at 112.)

### VI. Dikranis' Second Maternity Leave and Hiring for a Job at Good Samaritan Hospital

At some point during her second maternity leave, Dikranis decided that she needed extended time off due to unforeseen medical concerns relating to her children. (*Id*. at 137–39.)

On October 31, 2021, while on maternity leave, Dikranis applied for a part-time position with a different employer—Good Samaritan Hospital. (*Id*. at 154.) Dikranis testified that she applied for the Good Samaritan position because she was not ready to return to work in a full-time capacity as required by NUMC, but had the capacity to work part-time and needed the income in light of the fact that her maternity leave was unpaid and because her commute from home to Good Samaritan was better suited to her childcare obligations.[5] (*Id*. 158–60.) Dikranis

[5] Dikranis also asserts that she "felt it best to pursue other opportunities because she was still receiving canvas letters from NUMC for the full-time position she had already been offered and

was offered a position at Good Samaritan on November 8, 2021, which she accepted. (*Id*. at 154.) Dikranis began work at Good Samaritan Hospital on December 6, 2021, the date on which she was scheduled to return to work at NUMC. (*Id*. at 156–57.)

On December 2, 2021, several weeks after she accepted employment at Good Samaritan and several days before she was scheduled to return to work at NUMC, Dikranis texted Flynn: "[A]fter a discussion with my husband we feel it would be advantageous to request more time off for maternity leave. I have been in contact with Cathy from HR and have submitted the necessary paperwork for my request. I anticipate my date of return to be 2/28." (ECF No. 30-66.) That same day, Dikranis submitted to NUMC Human Resources an Application for Child Care Leave, which retroactively sought leave from September 30, 2021, to February 28, 2022. (ECF No. 30-22; Dikranis Tr. at 142–43.)

Cathy Dragotti denied Dikranis' application by letter on the same day it was submitted on the following basis: "Your request for additional time has been denied. You do not qualify under our policy. To be eligible you must have completed one full-year of full-time service." (Dec. 2, 2021 Letter, ECF No. 30-23.) To support the existence of such a policy, which Dikranis disputes, NUMC attaches a Human Resources Leave of Absence Policy guide, effective November 2021 (ECF No. 30-17), and the Collective Bargaining Agreement between NUMC and the Civil Service Employees Association – Nassau Local 830 (ECF No. 30-18). The Leave of Absence policy guide states that "[e]mployees are required to complete an 'Employee Request and

---

accepted, meaning [that NUMC was] still fielding candidates." (Pl.'s 56.1 Resp. ¶ 82.) However, her only citation for the assertion that NUMC was fielding candidates for her full-time position are two letters dated February 4, 2022 and March 4, 2022—months *after* the termination of her employment on December 20, 2024. (*See* ECF No. 30-63.) Accordingly, this assertion is unsubstantiated.

Authorization for Leave' form in Human Resources prior to the commencement of their leave. The request for the child care leave must be accompanied by medical documentation from an appropriate physician (pediatrician, delivering OB/GYN, etc.)." (ECF No. 30-17 at 4.) Under a sub-section labeled "Child Care Leave in accordance with Collective Bargaining Agreement," the Leave of Absence Policy guide provides that "*[u]pon completion of one year of service* full time employees are eligible for Child Care Leave." (ECF No. 30-17 at 4 (emphasis added).) The It further provides, "Employees with *less than one year of actual completed service* are *not eligible* for the one year leave of absence." (*Id*. (emphasis added).)

The CBA contains a section entitled "Child Care Leave" which provides, "No employee shall be eligible for Child Care Leave until after the completion of one full year of actual completed service." (ECF No. 30-18 at 49–50.) Separately, Section 44 of the CBA is titled "Exclusive Benefits for Certain Employees Working Less Than Full-Time" and includes a subsection regarding part-time employees hired on or after April 1, 1985. (*Id*. at 50, 53.) Section 44 provides:

> 44-5.1. Part time employees shall not receive any time and leave benefits until such time as they have completed one thousand . . . hours of employment with NHCC. They shall, however, receive the benefits of Section 44-4.2, except they shall not receive supplemental leave at half-pay.
>
> 44-5.2. After completing one thousand . . . hours of employment with NHCC, employees shall receive the vacation leave benefits of Section 42-2, and the pro-rated sick leave benefits of Section 42-5.

(*Id*. at 53.) The above-referenced sections and Sections 44-4.2, 42-2, and 42-5 outline specific leave benefits, including vacation, sick, and bereavement leave, but contain no reference to childcare leave. (*Id*. at 41, 42–43, 56–57.)

Dikranis attests that Flynn had permitted another part-time occupational therapist, Eileen Barbagallo, to take eleven months of leave following childbirth. (*See* Dikranis Decl.

¶ 21.) Dikranis does not identify what type of leave Barbagallo was permitted to take, such as whether it was parental leave, childcare leave, medical leave or some combination. (*See id.*) Dikranis also attests that Flynn granted other NUMC employees, including Carol Chamoff, Nicole Simmons, and Lynn Warkentin, permission to take leave but does not address whether these employees worked part-time or full-time, what type(s) of leave they were granted, the duration of such leave, and when such leaves were taken. (*Id.*) Nor does Dikranis introduce any evidence suggesting that Flynn had decisionmaking authority over whether to grant an employee's request for childcare leave.

### VII. NUMC's Termination of Dikranis' Employment

On December 9, 2021, NUMC sent a letter to Dikranis informing her that she had been on leave from work since September 30, 2021, and had not returned to work as scheduled on December 6, 2021. (ECF No. 30-24.) NUMC directed Dikranis to return to work by December 16, 2021, or face termination. (*Id.*) Dikranis did not return to work at NUMC and was terminated on December 20, 2021. (ECF No. 30-25.)

## PROCEDURAL HISTORY

Dikranis filed the Complaint in this action on October 22, 2022. (ECF No. 1.) Defendants timely filed an Answer on January 16, 2023. (ECF No. 11.) The parties engaged in discovery from April 2023 through June 2024. (*See* ECF No. 14; Elec. Order, May 6, 2024.) The parties participated in a settlement conference before Magistrate Judge Shields on July 23, 2024, but did not reach a resolution. (Min. Entry, July 23, 2024.)

On August 28, 2024, Defendants filed a request for a pre-motion conference regarding an anticipated motion for summary judgment, and Dikranis filed a response on September 10, 2024. (ECF Nos. 22, 23.) This Court waived the pre-motion conference requirement and directed the

parties to complete briefing on the motion for summary judgment by November 26, 2024, which the Court later extended to January 17, 2025, upon the parties' requests for extensions of time. (Elec. Orders, Sept. 17, 2024, Sept. 19, 2024, December 19, 2024.)

On January 17, 2025, Defendants filed their fully-briefed motion for summary judgment pursuant to the Court's recommended bundling procedure. (ECF No. 30.) It includes:

- Defendants' motion for summary judgment ("Mot.," ECF No. 30-29);
- Defendants' Rule 56.1 Statement (ECF No. 30-30);
- the Declaration of N. Dean Boyer, counsel for Defendants (ECF No. 30-1), attaching:
    - excerpts from the transcript of the deposition of Sarah Dikranis (ECF No. 30-2);
    - excerpts from the transcript of the deposition of Elizabeth Flynn (ECF No. 30-3);
    - excerpts from the transcript of the deposition of Cathy Dragotti (ECF No. 30-4);
    - excerpts from the transcript of the deposition of Kasi Bowen (ECF No. 30-5);
    - excerpts from the transcript of the deposition of Arlett Bailey (ECF No. 30-6);
    - Dikranis' NUMC Probationary Hire appointment documentation (ECF No. 30-7);
    - a January 19, 2019 email from NUMC Human Resources to Dikranis (ECF No. 30-8);
    - April 16, 2021 text messages between Flynn and Jessica Schelin (ECF No. 30-9);
    - April 23, 2021 text messages between Flynn and Dikranis (ECF No. 30-10);
    - email messages dated May 17, 2021 through May 24, 2021 between Flynn and Kasi Bowen (ECF No. 30-11);

- email messages dated June 10, 2021 through June 11, 2021 between NUMC HR staff and the Nassau County Civil Service Commission (ECF No. 30-12);
- a June 25, 2021 Civil Service "canvas letter" sent to Arlett Bailey (ECF No. 30-13);
- emails dated July 8, 2021 through July 27, 2021 between Dikranis and an attorney who represented her in a personal injury action (ECF No. 30-14);
- September 15, 2021 text messages between Flynn and Dikranis (ECF No. 30-15);
- a September 9, 2021 Non-FMLA Medical Leave Approval Form for Dikranis (ECF No. 30-16);
- NUMC's Leave of Absence Policy guide, effective November 2021 (ECF No. 30-17);
- the Collective Bargaining Agreement between NUMC and the Civil Service Employees Association – Nassau Local 830 (ECF No. 30-18);
- Dikranis' log of hours worked and paid from September 20, 2020 to September 30, 2021 (ECF No. 30-19);
- a non-FMLA leave application from Dikranis dated August 25, 2021 (ECF No. 30-20);
- November 11, 2021 emails between Dikranis and Good Samaritan Hospital (ECF No. 30-21);
- a December 2, 2021 application for childcare leave submitted by Dikranis to NUMC (ECF No. 30-22);
- a December 2, 2021 letter signed by Cathy Dragotti to Dikranis communicating the denial of her request for childcare leave (ECF No. 30-23);
- a December 9, 2021 letter from NUMC Human Resources to Dikranis (ECF No. 30-24);
- a December 20, 2021 termination notice from NUMC to Dikranis (ECF No. 30-25);
- Dikranis' complaint with the New York State Division of Human Rights, which was signed on December 23, 2021, and filed on December 28, 2021 (ECF No. 30-26);

  - the New York State Division of Human Rights' Determination after Investigation (ECF No. 30-27) regarding Dikranis' complaint; and
  - the Complaint in this action (ECF No. 30-28).

- Dikranis' brief in opposition to the summary judgment motion ("Opp'n," ECF No. 30-31);

- Dikranis' Rule 56.1 Counterstatement ("Pl.'s 56.1 Resp.," ECF No. 30-34);

- the Declaration of Sarah Dikranis, which attaches the following exhibits (ECF No. 30-32):

  - text messages between Flynn and Jessica Schelin dated April 16, 2021 through April 23, 2021, as well as text messages between Flynn and Dikranis dated April 23, 2021 (ECF No. 30-35);
  - April 23, 2021 text messages between Dikranis and Flynn (ECF No. 30-36);
  - a May 11, 2022 letter from the Nassau County Civil Service Commission to Dikranis denying her request under the Freedom of Information Law (ECF No. 30-37);
  - an undated chronology of events written by Dikranis regarding her employment at NUMC, including the events leading up to her termination (ECF No. 30-38);
  - a May 2018 photo of Dikranis (ECF No. 30-39);
  - a September 9, 2021 Non-FMLA Medical Leave Approval Form for Dikranis (ECF No. 30-40);
  - emails from Dikranis to Cathy Dragotti dated October 12, 2021, and December 2, 2021, regarding Dikranis' request for extension of maternity leave (ECF No. 30-41);
  - undated text messages between Dikranis and Dena Adler Gilbert (ECF Nos. 30-42, 30-43);
  - undated text messages between Dikranis and an individual named "Keisha" (ECF No. 30-44);
  - April 16, 2021 text messages between Dikranis and Schelin (ECF No. 30-45);
  - an undated resume for Jessica Schelin (ECF No. 30-46);

- undated text messages between Dikranis and Schelin (ECF No. 30-47);
- an April 28, 2021 NUMC Personnel Requisition Form for a full-time occupational therapist position, submitted by Flynn (ECF No. 30-48);
- emails between Flynn and Bowen, dated May 17, 2021, to May 20, 2021 (ECF No. 30-49);
- July 1, 2021 text messages between Dikranis and Schelin (ECF No. 30-50);
- undated text messages between Dikranis and Flynn (ECF No. 30-51);
- a depiction of July 21, 2021 text messages that do not identify the senders or recipients, but which Dikranis attests were exchanged between herself and Gilbert (ECF No. 30-52);
- a July 26, 2021 NUMC Employability Form regarding Arlett Bailey (ECF No. 30-53);
- a copy of NUMC Policies and Procedures regarding Leaves of Absence, effective as of November 1, 2021 (ECF No. 30-54);
- the Collective Bargaining Agreement between NUMC (now Nassau Health Care Corporation) and the Civil Service Employees Association (ECF No. 30-55);
- Arlett Bailey's employee time sheet for the months of August 2021 and September 2021 (ECF No. 30-56);
- an August 23, 2021 NUMC Personnel Requisition Form for a full-time occupational therapist position, which was submitted by Flynn (ECF No. 30-57);
- text messages between Dikranis and Flynn dated September 15 and September 16, 2021 (ECF No. 30-58);
- a May 16, 2022 email from Kathryn Johnson, NUMC Payroll Supervisor, to Dikranis (ECF No. 30-59);
- Dikranis' NUMC employee time sheets from September 30, 2020 to September 30, 2021 (ECF No. 30-60);
- Dikranis' calculation of hours worked at NUMC from September 30, 2020, to September 30, 2021 (ECF No. 30-61);
- Dikranis' personal calendar from December 1, 2021 to January 31, 2022 (ECF No. 30-62);

   - a February 24, 2022 Civil Service letter from NUMC to Dikranis (ECF No. 30-63);
   - emails between Flynn and Dragotti, dated December 1, 2021 and December 2, 2021 (ECF No. 30-64);
   - a December 2, 2021 letter from Dragotti (ECF No. 30-65);
   - December 2, 2021 text messages between Dikranis and Flynn (ECF No. 30-66);
   - Dikranis' December 23, 2021 complaint filed with the New York State Division of Human Rights (ECF No. 30-67);
   - NUMC performance reviews for Dikranis, dated September 16, 2020, June 18, 2019, and May 28, 2021 (ECF No. 30-68);
   - Dikranis' Civil Service rating for a May 30, 2021 exam (ECF No. 30-69);
   - an undated text message from Dikranis to Flynn (ECF No. 30-70);
   - Arlett Bailey's July 23, 2021 Application for Employment at NUMC (ECF No. 30-71);
   - an August 8, 2021 email from Dikranis to Flynn (ECF No. 30-72);
   - Bailey's employee time sheet from August 1, 2021, to September 30, 2021 (ECF No. 30-73);
   - Defendants' October 16, 2023 Responses to Dikranis' First Set of Interrogatories (ECF No. 30-74);
   - Defendants' April 29, 2022 Answer to the Complaint (ECF No. 30-75);
   - Nassau County Civil Service Commission's Civil Service list (ECF No. 30-76);
   - undated text messages between Dikranis and Flynn (ECF No. 30-77); and
- a December 28, 2024 affidavit of non-party Jessica Schelin Fatsis (ECF No. 30-33); and
- NUMC's reply brief in support of its motion for summary judgment ("Reply," ECF No. 30-78).

On September 23, 2025, the Court heard oral argument on Defendants' Motion. (Min. Entry, Sept. 23, 2025.) The parties participated in another settlement conference before Judge

Shields on November 17, 2025, which concluded without settlement. (Min. Entry, Nov. 17, 2025; ECF No. 35.)

**JURISDICTION**

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Dikranis brings multiple federal claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq, as well as 42 U.S.C. § 1983.

Venue in the Eastern District of New York is proper under 28 U.S.C. § 1391(b)(2) because the Complaint alleges that a substantial part of the events that gave rise to Dikranis' claims occurred in this District. (*See* Compl. ¶ 3.)

**LEGAL STANDARDS**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a material question of fact. *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022).[6] "A fact is material if it might affect the outcome of the suit under the governing law." *Cunningham v. Cornell Univ.*, 86 F.4th 961, 980 (2d Cir. 2023) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)), *rev'd on other grounds,* 604 U.S. 693 (2025). A dispute of "material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

In order to defeat summary judgment, the non-moving party must set forth sufficient facts showing that there is a genuine dispute for trial. *See* Fed. R. Civ. P. 56(c). Under this standard, if the movant meets its burden, the nonmoving party "must come forward with admissible evidence

[6] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, brackets, and citations.

sufficient to raise a genuine issue of fact for trial" in order to avoid summary judgment. *McKinney*, 49 F.4th at 745–46. The non-moving party "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *FTC v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019); *see also Daly v. Westchester Cnty. Bd. of Legislators*, No. 23-cv-1220, 2024 WL 3264125, at *2 (summary order) (2d Cir. July 2, 2024). "Mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

A court considering whether summary judgment is appropriate "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Cunningham*, 86 F.4th at 980; *see also Woods v. Centro of Oneida, Inc.*, 103 F.4th 933, 939 (2d Cir. 2024) ("We may find for the movant . . . only if we conclude that on the record presented, considered in the light most favorable to the non-movant . . . no reasonable jury could find in the [non-movant]'s favor."). If "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment must be denied. *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir. 1983); *see also Jones v. City of New York*, 603 F. App'x 13, 14 (2d Cir. 2014) (summary order) (holding that summary judgment must be denied "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

## DISCUSSION

Before this Court is Defendants' request for summary judgment on Dikranis' remaining claims in this action: (1) her Title VII disparate treatment and retaliation claims based on NUMC's failure to promote her to a full-time occupational therapist position in June or July of 2021; (2) her Title VII disparate treatment and retaliation claims based on NUMC's termination

of her employment on December 20, 2021; (3) her Title VII disparate treatment and retaliation claims challenging NUMC's denial of her June 25, 2021 request to return to work from medical leave with a 30-pound lifting restriction; (4) her Title VII disparate treatment and retaliation claims challenging NUMC's denial of her request to extend her second parental leave from December 6, 2021 to February 28, 2022; (5) her Section 1983 disparate treatment and retaliation claims against Flynn for the same aforementioned actions—failure to promote her in June or July of 2021, failure to accommodate her requests to return to work with a lifting restriction on June 25, 2021, failure to extend her childcare leave to February 28, 2022, and termination of her employment on December 20, 2021.[7]

Defendants' motion for summary judgment is granted in its entirety. First, even assuming Dikranis has met her burden of demonstrating a prima facie case on each of her Title VII disparate treatment and failure-to-accommodate claims, NUMC has satisfied its burden of demonstrating legitimate, nondiscriminatory reasons regarding each alleged adverse action, and Dikranis has failed to point to evidence raising a material question of fact as to whether those reasons were pretextual or the adverse actions were based on a motive to discriminate on the

[7] While the Complaint also brought claims for interference and retaliation in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq*., Dikranis withdrew these claims during oral argument on September 23, 2025. (*See* Hr'g Tr. at 28–29.) The Complaint also brought Title VII hostile work environment claims, but this Court deemed these claims abandoned during the September 23, 2025 oral argument in light of Dikranis' failure to address NUMC's arguments for summary judgment on these claims in her opposition submissions. (*See id*. at 10; Compl. ¶ 51; Mot. at 15–18; *see generally* Opp'n.) "[W]hen a counseled party moves for summary judgment, a partial response [by the non-movant] arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims." *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016). Accordingly, the FMLA claims are no longer before this Court due to Dikranis' voluntary dismissal of those claims, and the Title VII hostile work environment claims are dismissed as abandoned.

basis of pregnancy, childbirth, or a related medical condition. Accordingly, summary judgment is granted to NUMC with respect to the Title VII disparate treatment and failure-to-accommodate claims.

Second, summary judgment is granted to NUMC with respect to Dikranis' Title VII retaliation claims, which fail at the prima facie stage. Dikranis has failed to identify any evidence in the record raising a genuine dispute of material fact as to whether she engaged in any protected activity required to survive summary judgment.

Third, in light of the fact that none of the Title VII claims against NUMC survive summary judgment, Flynn is granted summary judgment on the Section 1983 claims. Dikranis fails to raise a genuine issue of material fact as to whether NUMC's legitimate, nondiscriminatory reasons for the adverse actions were pretextual or at least motivated in part by an intent to discriminate on the basis of pregnancy, childbirth, or a related medical condition. Additionally, the retaliation claims against Flynn under Section 1983 and the Equal Protection Clause of the Fourteenth Amendment do not survive summary judgment due to the absence of any genuine dispute as to whether Dikranis engaged in protected activity, as required to make out a prima facie case of retaliation with respect to any of the alleged retaliatory actions.

## I. Title VII

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The Pregnancy Discrimination Act of 1978 amended Title VII such that the phrase "because of . . . sex" in the statute "include[s] . . . because of or on the basis of pregnancy, childbirth, or related medical conditions," and provides that "women affected by pregnancy,

childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work . . . ." 42 U.S.C. § 2000e(k); *see also Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 210 (2015).

Dikranis' Title VII claims, whether brought under disparate treatment, failure-to-accommodate, or retaliation theories, are analyzed under the well-established, three-part burden-shifting framework for Title VII discrimination claims set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 308 (2025) (disparate treatment); *Young*, 575 U.S. at 210 (pregnancy accommodation); *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (same); *Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 45 (2d Cir. 2025) (retaliation). "At the first step of the familiar three-step inquiry, the plaintiff bears the 'initial burden' of 'establishing a prima facie case' by producing enough evidence to support an inference of discriminatory motive," *Ames*, 605 U.S. at 308, or in the retaliation context, an inference of a retaliatory motive, *Edelman*, 141 F.4th at 48.

With respect to Title VII disparate treatment claims, a plaintiff may establish a prima facie case "by showing that '(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination.'" *Bart v. Golub Corp.*, 96 F.4th 566, 570 (2d Cir. 2024), *cert. denied sub nom. The Golub Corp. v. Elaine Bart*, 145 S. Ct. 173 (2024). "For most plaintiffs, the first step of the *McDonnell Douglas* framework—the prima facie burden—is 'not onerous.'" *Ames*, 605 U.S. at 308.

Concerning the "adverse employment action" requirement, under the Supreme Court's decision in *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346 (2024), a plaintiff "does not have to show . . . that the harm incurred was significant[,] serious, or substantial, or any similar

adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Id*. at 355. Rather, the plaintiff only needs to show "some harm respecting an identifiable term or condition of employment"—i.e., the plaintiff must have been "left [ ] worse off" but not necessarily "significantly so." *Id*. at 355, 359.

Two of Dikranis' Title VII disparate treatment claims are brought under a theory of failure to provide pregnancy accommodations: her claims that NUMC denied Dikranis permission to return to work from medical leave with a 30-pound lifting restriction on June 25, 2021, and that NUMC denied her request to extend her second maternity leave from December 6, 2021 to February 28, 2022. (*See* Opp'n at 10–11.) "[A] plaintiff alleging that the denial of an accommodation constituted disparate treatment under [the PDA] may make out a prima facie case by showing, as in *McDonnell Douglas*, that she belongs to the protected class, that she sought accommodation, that the employer did not accommodate her, and that the employer did accommodate others 'similar in their ability or inability to work.'" *Young*, 575 U.S. at 229.

With respect to all disparate treatment claims—including those brought under a pregnancy accommodation theory—once a plaintiff has either established a prima facie case or at least raised a genuine dispute of material fact as to the existence of a prima facie case, "the burden then 'shift[s] to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Ames*, 605 U.S. at 308–309. "Finally, if the employer articulates such a justification, the plaintiff must then have a 'fair opportunity' to show that the stated justification 'was in fact pretext' for discrimination." *Id*. at 309. A claim will survive summary judgment where the plaintiff can point to specific evidence in the record raising a genuine dispute of fact as to whether the employer's proffered reason was pretext or whether the adverse action was undertaken because of, or on the basis of, pregnancy, childbirth, or a related medical

condition. *Lenzi*, 944 F.3d at 107–108. A plaintiff must point to evidence supporting a material question of fact as to whether "the motive to discriminate was *one of the employer's motives*, even if the employer also had other, lawful motives that were causative in the employer's decision." *Id.* (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013) (internal quotation marks omitted)).

"Even in the discrimination context . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 170 (2d Cir. 2014). "A plaintiff cannot merely rationalize, explain, or disagree with an employer's proffered non-discriminatory reasons to survive summary judgment." *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 29 (E.D.N.Y. 2015); *see also Cardo v. Arlington Cent. Sch. Dist.*, 473 F. App'x 21, 23 (2d Cir. 2012) (summary order) ("While Cardo disputes the specifics of some of the incidents cited by defendants, he does not deny that these incidents occurred, and offers no evidence that the District did not in good faith conclude that he had difficulties getting along with others."); *Fleming v. MaxMara USA, Inc.*, 644 F. Supp. 2d 247, 266 (E.D.N.Y. 2009), *aff'd*, 371 F. App'x 115 (2d Cir. 2010) ("[A] plaintiff's factual disagreement with the validity of an employer's non-discriminatory reason for an adverse employment decision does not, by itself, create a triable issue of fact.").

### A. Disparate Treatment Claims

Dikranis claims that NUMC engaged in disparate treatment by (1) failing to promote her to the full-time occupational therapist position while she was on medical leave in June and July 2021, and (2) by terminating Dikranis from her full-time occupational therapist position in December 2021.

Here, it is not clear that Dikranis has identified evidence in the record that establishes or at least raises a genuine dispute of material fact as to each element required to make out a prima face case of disparate treatment for these two claims. However, the Court need not resolve that issue because, even assuming that Dikranis has met her initial burden, NUMC has identified evidence in the record supporting its assertion of legitimate, non-discriminatory reasons as to why Dikranis was not promoted to a full-time position in June or July 2021 and why her employment was terminated in December 2021. With respect to the denial of a promotion, NUMC shows that Dikranis was on medical leave and never completed the steps necessary to be promoted to a full-time role in June or July 2021, which include the completion of required Human Resources paperwork and meeting with Rochelle Baum. With respect to the termination of her employment, NUMC points to evidence showing that, in December 2021, NUMC terminated Dikranis' employment when she failed to return to her full-time occupational therapist position by December 16, 2021, which was after the scheduled end of her maternity leave on December 6, 2021. The burden thus shifts to Dikranis to point to any evidence in the record that raises a genuine dispute of material fact as to whether NUMC's failure to promote her in June or July 2021 and termination of her employment later that year were "motivated at least in part by" pregnancy, childbirth, or a related medical condition. *Bart*, 96 F.4th at 576. Because Dikranis fails to meet that burden, NUMC merits summary judgment on these claims.

***i. Failure-to-Promote Claim***

Dikranis challenges NUMC's failure to promote her to a full-time occupational therapist position in June or July 2021. Evidence in the record shows, however, that NUMC *did* seek to promote Dikranis on May 27, 2021, when Flynn told her that the full-time position was hers. *See* Factual Background Section III–IV. However, although Dikranis was required to meet with

Human Resources to complete necessary paperwork in order to resign her part-time role, accept the full-time role, and provide a start date, Dikranis did not do so before going on medical leave on June 16, 2021, following a car accident. *See id; see also* Bowen Tr. at 31 (describing NUMC Human Resources requirements for the conversion of an employee from part-time to full-time employment). Thus, NUMC has shown that it had a legitimate, nondiscriminatory reason for hiring another employee—Arlett Bailey—to fill the full-time role in July 2021: at the time of the hire, Dikranis was on medical leave and had not completed the required paperwork, and until July 22, 2021 had not provided a date on which she would return to work at NUMC without any medical restrictions, such as a restriction on the amount of weight that she could lift while performing her role.

Dikranis argues that NUMC's reasons are pretextual and relies on a number of statements by Flynn as well as contradictory assertions in her own factual submissions. However, even when viewing the record in the light most favorable to Dikranis, this evidence fails to raise a genuine dispute of material fact as to whether NUMC's failure to promote Dikranis in June or July 2021 was motivated in part by an intent to discriminate against her on the basis of pregnancy, childbirth, or a related medical condition.

*1. NUMC's Legitimate, Nondiscriminatory Reason*

According to NUMC, as of June 11, 2021, it was in the process of granting Dikranis the full-time occupational therapist role, but Dikranis was not transitioned to that role in June or July 2021 because she was on medical leave following a car accident and had not completed the necessary paperwork with Human Resources and because her role could not be converted from part-time to full-time while she was on medical leave. (Mot. at 12–13.) NUMC also argues that it hired Bailey instead of Dikranis sometime in July 2021, while Dikranis was still on medical

leave, because Bailey had completed the steps for hire and confirmed when she could start work in the full-time occupational therapist role. (Bailey Tr. at 16–17, 25–30; ECF Nos. 30-53, 30-71.) Finally, NUMC also maintains that it gave Dikranis the next available full-time occupational therapist position in September 2021, which was shortly after she returned from medical leave and just four days before Dikranis began her second maternity leave. (Mot. at 7.)

NUMC has met its burden of articulating a legitimate, nondiscriminatory reason for why Dikranis was not transitioned from a part-time to full-time position in June or July 2021. The undisputed facts demonstrate the following. Flynn offered Dikranis the full-time position on or around May 27, 2021, when she told Dikranis, "I guess if you want the job it's yours." (Dikranis Tr. at 147; Pl.'s 56.1 Resp. ¶ 32.) Following Flynn's inquiry, on June 11, 2021, Baum of NUMC Human Resources confirmed to Bowen that Dikranis could be converted from a part-time to full-time role without canvassing interest from those on the Civil Service list. (ECF No. 30-12.) As of June 11, 2021, NUMC Human Resources was in the process of converting Dikranis' employment from part-time to full-time but required her to confirm her start date and meet with Rochelle Baum of NUMC Human Resources to complete required paperwork. (*Id.*) On June 16, 2021, Dikranis was injured in a car accident and went on unpaid medical leave, which did not end until July 28, 2021. (Dikranis Tr. at 79.) On or around June 25, 2021, Dikranis sent Flynn a doctor's note permitting her to return to work with a 30-pound lifting restriction. (ECF No. 30-51 at 1.) Flynn responded that NUMC HR would not permit Dikranis to return until she was cleared of all lifting restrictions. (*Id.*) Accordingly, as of June 25, 2021, it was unknown when Dikranis would be cleared to return to work at NUMC as an occupational therapist without any restrictions. (Dikranis Tr. at 84–85.) That same day, NUMC Human Resources sent a canvas letter to the Civil Service list regarding the full-time occupational therapist position. (Dikranis

Tr. at 90, 98; ECF No. 30-13.) On July 1, 2021, Bailey responded to the letter, expressing her interest in a full-time role. (ECF No. 30-13.) According to Dikranis' factual assertions, at some point in July 2021, while Dikranis was still on medical leave and had still not completed the necessary Human Resources paperwork, NUMC hired Bailey to serve in the full-time occupational therapist position. (Pl.'s 56.1 Resp. ¶ 58; *see also* Flynn Tr. at 70–71.) On July 22, 2021, Dikranis texted Flynn and provided a note from her doctor indicating that she was cleared to return to work with no restrictions. (Dikranis Tr. at 79.) Bailey completed the necessary Human Resources paperwork at NUMC on July 23, 2021, and the required physical on July 26, 2021. (Bailey Tr. at 16–17, 25–30; ECF Nos. 30-53, 30-71.) She was scheduled to start work as a full-time occupational therapist on August 22, 2021, but her start date was later pushed to August 29, 2021, following a personal tragedy. (Bailey Tr. at 33–36.) Dikranis returned to work without restrictions on July 28, 2021. (Dikranis Tr. at 107–109.)

These undisputed facts support NUMC's assertion that it had a legitimate, nondiscriminatory reason for hiring Bailey rather than Dikranis for the full-time occupational therapist position. Dikranis points to no evidence in the record to raise a genuine dispute of material fact as to whether NUMC's process of converting her employment from part-time to full-time was contingent upon her meeting with Baum and completing required human resources paperwork, which she never did at any time before returning to work on July 28, 2021. (ECF No. 30-12; Bowen Tr. at 31.) Indeed, in September 2021, when NUMC promoted Dikranis to a full-time occupational therapist position around two months after the events at issue in the failure-to-promote claim, she was again instructed to meet with Baum in her office to fill out the required Human Resources paperwork, which she did at that time. (Dikranis Tr. at 122–24; ECF No. 30-58.) However, there is no dispute that Dikranis never completed this paperwork or met with

Baum, whether remotely or in person, at any time between June 11, 2021, when NUMC Human Resources was in the process of converting her position from part-time to full-time employment, and July 22, 2021, when Dikranis notified Flynn that she was cleared to return to work without restrictions. Moreover, there is no dispute that from June 16, 2021 through July 28, 2021, Dikranis was on medical leave. Sometime during that time period, NUMC filled the full-time occupational therapist position with Bailey, a candidate from the Civil Service list who completed the steps required for hire, including the required Human Resources paperwork and physical and the provision of a start date.

In support of its legitimate, non-discriminatory reason for not converting Dikranis to a full-time role in June or July 2021, NUMC asserts that it has a practice of not changing employees' positions from part-time to full-time while they are on leave in light of the fact that some employees do not return from leave. (Mot. at 12–13.) Dikranis disputes the existence of such a practice on the basis that it is not a written NUMC policy or otherwise set forth in the Civil Service Law. (Opp'n at 16.) Whether or not such a practice exists is not material to determining whether NUMC has articulated a legitimate, non-discriminatory reason for the failure to promote. Here it is undisputed that Dikranis had not met with Baum, whether in person or remotely, or completed the Human Resources paperwork required to transition from a part-time to a full-time role between June 11, 2021, and the commencement of her medical leave on June 16, 2021. It also undisputed that, from June 16, 2021, to July 22, 2021, Dikranis had not even provided NUMC with a date by which she could return to work without restrictions. The undisputed record shows that, during that timeframe, NUMC had an open full-time position (June 25, 2021 Canvas Letter, ECF No. 30-13), went through the standard process of canvassing the Civil Service list to identify interested candidates (Flynn Tr. at 8, 20; Bowen Tr. at 8), and

ultimately hired a finalist who expressed interest in response to the canvas letter and who, unlike Dikranis, was able to confirm a start date (ECF No. 30-13).

Dikranis attempts to dispute NUMC's assertion that "[w]hile Dikranis was out on leave from the car accident, Arlett Bailey was hired to the fulltime OT role from the Civil Service list," relying on certain testimony by Bailey, Flynn, and Bowen. (*See* Pl.'s 56.1 Resp. ¶ 53.) However, Dikranis herself asserts numerous times in her Rule 56.1 Counterstatement that Bailey was hired *before* July 22, 2021, which is the undisputed date on which Dikranis informed Flynn that she was cleared to return to work without any restrictions:

- In Paragraph 53 of her Counterstatement of Material Facts, Dikranis asserts: "*On July 21, 2021*, Flynn announced to the entire OT department that she hired Bailey. (Ex. 18)." (*See id*. (emphasis added))
- In Paragraph 54, Dikranis asserts, "Flynn did not announce Bailey's hire *until July 21, 2021*." (Pl.'s 56.1 Resp. ¶ 54 (emphasis added).)
- In Paragraph 58 of her Counterstatement, Dikranis states: "First, Bailey was hired *on July 20, 2022, only two days before Sarah was cleared to return without restrictions* to the role she already accepted." (*Id*. ¶ 58 (emphasis added).)

Thus, in her Counterstatement of Material Facts, Dikranis takes the position that NUMC hired Bailey on July 20, 2021, and that Flynn announced that hire on July 21, 2021—dates that *preceded* Dikranis' July 22, 2021 communication to Flynn that she was cleared to return to work at NUMC without any restrictions. Accordingly, Dikranis' assertion that Bailey was not hired as a full-time occupational therapist from the Civil Service list while Dikranis was on medical leave is squarely contradicted by her own factual assertions, which this Court accepts as true in resolving this Motion.[8]

[8] Dikranis also asserts in her sworn affidavit that Bailey was hired before she returned from medical leave. (*See* Dikranis Decl. ¶ 13 ("[O]n July 22, 2021, when I provided Flynn with my

Dikranis is not permitted to walk back her own factual admissions in an effort to create a genuine dispute of material fact as to whether NUMC hired Bailey while Dikranis was on medical leave. *See McKinney*, 49 F.4th at 744 ("Parties are bound by their concessions in Rule 56.1 Statements" and may not "walk back these admissions to create genuine issues of material fact . . . .").

Moreover, viewing the record in the light most favorable to Dikranis, drawing all inferences in her favor, and giving full consideration to the evidence on which she relies in disputing the timing of Bailey's hire (*see* Pl.'s 56.1 Resp. ¶ 53), NUMC hired Bailey for the full-time occupational therapist role *before* Dikranis (1) completed any of the human resources paperwork required to resign her part-time position and assume the full-time role, (2) returned from medical leave without restrictions on July 28, 2021. On June 25, 2021—while Dikranis was on medical leave without a date for returning to work without restrictions—NUMC Human Resources sent Civil Service list candidates a canvas letter to identify candidates interested in a full-time position. (ECF No. 30-13.) In response, on July 1, 2021, Bailey expressed interest in the full-time role. (*Id.*) As explained by Bowen of NUMC Human resources, once individuals respond to a canvas letter,

> the résumés are sent to the [occupational therapist] department. They do their interviewing. Then when they want to hire someone, they let, usually, Josephine Anello know. And then she reaches out to do -- start preemployment processing. A person comes and does an application. They have to do a preemployment physical. And then we would schedule a start date.

---

return-to-work forms, Flynn advised me that she had hired someone else for the full-time position due to my absence, and because she was unable to reach me on the Civil Service list.").) However, for reasons explained further below, the Court declines to consider Dikranis' declaration as a sole basis for creating any genuine dispute of material fact and therefore considers this statement only for the purpose of highlighting the inconsistencies in Dikranis' factual assertions relating to the timing of NUMC's decision to hire Bailey.

(Bowen Tr. at 37.) Flynn had already conducted an interview of Bailey in April or May 2021, during which Flynn informed her that she would be waiting for an open position. (Bailey Tr. at 14–16, 23.) Flynn hired Bailey sometime in July 2021 off the Civil Service list because, after the letters of interest were received on or around July 6, 2021, "if you don't pull somebody from the list, then the list expires and it has to go back to Civil Service," which delays the hiring process. (Flynn Tr. at 60–61.) While Flynn did not provide an exact date on which NUMC hired Bailey, she testified, "I do recall the list was expiring, so we pulled Arlett[] so that we could get somebody on board." (*Id*. at 63.)

Bailey testified in deposition that she had a phone call with Flynn on July 21, 2021, although she could not recall what they discussed. (Bailey Tr. at 16–17.) She went to NUMC in-person to complete the required Human Resources paperwork to accept the full-time role on July 23, 2021, and then completed her physical on July 26, 2021, which was required before scheduling her start date. (*Id*. at 25–30.) Thus, NUMC was in the process of completing Bailey's hiring on July 22, 2021, when Dikranis informed Flynn that she could return to work as a NUMC occupational therapist without any restrictions. Dikranis ultimately returned on July 28, 2021. (Dikranis Tr. at 107.) To the extent that Bailey's hire was not complete until July 26, 2021, when she completed the physical required before giving a start date, there is no dispute that Dikranis was still on leave at that time and had not completed any of the Human Resources paperwork required to resign her part-time position and assume the full-time role.

Lastly, in arguing for summary judgment on the failure-to-promote claim, NUMC invokes the "same actor inference" in light of the fact that it sought "to appoint Plaintiff to the first full-time OT position while Plaintiff was pregnant," "ensure[d] that she was ultimately appointed to the second full-time OT position further along in the same pregnancy," and also

"hired Plaintiff [in 2018] while she was pregnant." (Mot. at 14.) Under this doctrine, "[w]hen the same actor hires a person already within the protected class, and then later fires that same person, 'it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.'" *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000); *DiBenedetto v. Harman Int'l Indus., Inc.*, No. 22-cv-2029, 2026 WL 2942671, at *16 (same). As an initial matter, the Second Circuit has not resolved whether the "same actor inference" applies to Title VII disparate treatment claims or whether it only applies to ADEA claims. *See Buon v. Spindler*, 65 F.4th 64, 84 (2d Cir. 2023). It has nevertheless recognized that, in the Title VII context,

> at the summary-judgment stage, when the burden-shifting framework associated with *McDonnell Douglas* applies, the potential relevance of the same-actor inference is obvious: at step two of the *McDonnell Douglas* test, defendants are free to present evidence establishing a non-pretextual, non-discriminatory reason for the adverse action and may invoke the same-actor-inference, and at step three plaintiffs are afforded an opportunity to rebut that evidence, along with the same-actor inference.

*Id*. at 85.

Here, the parties dispute whether Flynn, and by extension NUMC, was aware that Dikranis was pregnant when she was initially hired to a part-time role on or around June 11, 2018.[9] Nevertheless, the undisputed evidence shows that, NUMC did in fact promote Dikranis to

---

[9] Flynn explained in deposition that she knew Dikranis was pregnant at the time of her interview because Dikranis "was showing," explaining, "I've seen many pregnant women. I've had three kids of my own, and she looked like she was pregnant. Did I ask her specifically? I didn't confirm with her and say are you pregnant, but I can tell she was. It didn't matter. I didn't ask her about it because it wasn't really relevant." (Flynn Tr. at 12; *see also* Def.'s 56.1 Statement ¶ 14.) Dikranis contests that she was visibly showing at the time of her interview and attaches photographs from the relevant time period in support. She also attests that when she told Flynn on her first day of work that she was pregnant, "based on [Flynn's] reaction, including her body language and facial expression, Flynn appeared shocked," "stated that I did not look pregnant, then quickly changed the subject." (Dikranis Decl. ¶ 2; *see also* Pl.'s 56.1 Resp. ¶ 14.) This

a full-time occupational therapist position in September 2021—around two months after NUMC did not convert her employment from part-time to full-time in June or July 2021, while Dikranis was on medical leave. Specifically, Dikranis returned to work without restrictions on July 28, 2021, and a second full-time position became available less than one month later, on or around August 23, 2021—a position that Flynn offered to Dikranis around two weeks later on September 9, 2021. (ECF No. 30-57; Dikranis Tr. at 122, 188.) Additionally, NUMC promoted Dikranis to this second full-time position even though it was aware that Dikranis would work for only around one week before starting maternity leave, which did in fact start just four days after she began the full-time position. (Dikranis Tr. at 124.) Here, the fact that NUMC promoted Dikranis to her desired role shortly after she returned from medical leave and did so knowing that Dikranis would take parental leave just days after starting the full-time position supports NUMC's assertion that the failure to transition Dikranis to full-time in June or July 2021 was because (1) she was on medical leave, and for most of that time, without a date on which she could return to work with no restrictions and (2) had not completed the required Human Resources paperwork.

*2. Pretext and Discriminatory Motive*

"To satisfy the third-stage burden under *McDonnell Douglas* and survive summary judgment in a Title VII disparate treatment case, a plaintiff may, but need not, show that the employer's stated reason was false, and merely a pretext for discrimination; a plaintiff may also satisfy this burden by producing other evidence indicating that the employer's adverse action

---

dispute over whether Flynn did or did not know that Dikranis was pregnant at the time of her interview and hire in 2019 is not material to the failure-to-promote claim, which concerns an alleged adverse action in June and July 2021, when everyone knew that Dikranis was pregnant with her second child. (*See* Dikranis Tr. at 145.)

was motivated at least in part by the plaintiff's membership in a protected class." *Bart*, 96 F.4th at 576. "So-called but-for causation is not the test. It suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." *Lenzi*, 944 F.3d at 108.

Dikranis fails to point to any evidence raising a genuine dispute of material fact as to whether NUMC's failure to promote her in June or July 2021 was motivated at least in part by an intent to discriminate on the basis of pregnancy, childbirth, or a related medical condition.

Dikranis advances four primary arguments in support of her contention that there is a genuine dispute of material fact as to whether NUMC's failure to promote her was because of pregnancy, childbirth, or a related medical condition. None are persuasive even when viewing the record in the light most favorable to Dikranis and drawing all inferences in her favor.

First, Dikranis contends that NUMC's proffered reasons are pretext because it hired Bailey for the first full-time occupational therapist position just days before Dikranis was scheduled to return to work with no restrictions. (Opp'n at 16–17.) In support, Dikranis relies on the date of Bailey's physical examination, which was completed on July 26, 2021, and the fact that Dikranis actually returned to work without restrictions on July 28, 2021. However, the undisputed facts show that at the time NUMC was conducting its hiring process for the full-time occupational therapist position and when it actually hired Bailey, Dikranis had not completed the required Human Resources paperwork and was out on medical leave, and for almost all of that time period, lacked a date by which she would return to work without restrictions. Dikranis acknowledges the following undisputed facts: (1) NUMC sent a canvas letter to the Civil Service list on June 25, 2021, and that at the time, Dikranis was not cleared to return to work without restrictions; (2) in response to the canvas letter, Bailey indicated her interest in the full-time

position on around July 1, 2021; (3) Flynn had interviewed Bailey several months before July 2021 as a prospective candidate for the full-time occupational therapist role; and (4) "[o]n July 21, 2021, Flynn announced to the entire OT department that she hired Bailey." (Pl.'s 56.1 Resp. ¶ 53; *see also* Bailey Tr. at 15, 23.)[10] Dikranis further acknowledges that she did not receive a doctor's note clearing her to return to work until July 22, 2021, which according to Dikranis, was the day *after* Flynn had announced to the department that Bailey was hired for the full-time position. (Dikranis Tr. at 102–103; Pl.'s 56.1 Resp. ¶ 53.)

Second, Dikranis argues that NUMC could have held the full-time position open for her because Bailey did not start working at NUMC until August 2021, which was *after* Dikranis had returned to work with no restrictions on July 28, 2021. (Opp'n at 16–17.) However, as discussed at length above, NUMC was not aware that Dikranis could return to work by July 28, 2021, at the time that Flynn hired Bailey on July 20, 2021, or when Flynn announced that decision to the department on July 21, 2021. Dikranis did not communicate her anticipated return date to Flynn until July 22, 2021—after the steps for finalizing Bailey's hire were already well underway. *See* Discussion Section I.A.i.1 *supra*.

---

[10] In support of her assertion that Flynn announced Bailey's hiring at a July 21, 2021 staff meeting, Dikranis relies on a photograph of a printout of text messages exchanged between Dikranis and Dena Gilbert on July 21, 2021, which read:

> Dikranis: Tell me . . . please just tell me she hired someone full-time who is starting August 16th . . .
>
> Gilbert: She came in yesterday and told us
>
> Dikranis: Told you what exactly?
>
> Gilbert: When one door closes lol . . .

(ECF No. 30-52; *see* Pl.'s 56.1 Resp. ¶ 53.) The Court assumes that these facts proffered by Dikranis are true for purposes of resolving this motion.

Third, Dikranis maintains that NUMC's reasons for failing to promote her are pretextual because "Flynn told Plaintiff a different story when she told Sarah why she was not receiving the position – specifically, that one reason she was not given the position was that she could not be reached on the civil service list." (Opp'n at 17.) In support, Dikranis cites paragraph 13 of her post-deposition affidavit, in which she attests:

> [O]n July 22, 2021, when I provided Flynn with my return-to-work forms, Flynn advised me that she had hired someone else for the full-time position due to my absence, and because she was unable to reach me on the Civil Service list.

(Dikranis Decl. ¶ 13.)

As an initial matter, Dikranis cannot rely solely on her affidavit to raise a genuine dispute of material fact at this stage of her case. "'Self-serving, conclusory affidavits, standing alone' do not suffice to create a triable issue of fact, nor do they, on their own, defeat a motion for summary judgment." *Carter-Marks v. Alstom Transp. USA Inc.*, 800 F. Supp. 3d 423, 455–56 (E.D.N.Y. 2025), *appeal dismissed* (Jan. 22, 2026); *see also Cestaro v. Prohaska*, 681 F. Supp. 3d 121, 125 (S.D.N.Y. 2023) ("A conclusory contradiction of undisputed evidence in a self-serving affidavit, unsupported by other evidence, is not by itself sufficient to create a genuine dispute of material fact."). Here, Dikranis' affidavit fails to cite any evidence in support of the assertion that Flynn informed her that the failure to promote was because "she was unable to reach me on the Civil Service list." (Dikranis Decl. ¶ 13.) Neither Dikranis nor Flynn provided deposition testimony to support this assertion. Moreover, Dikranis' own testimony supports the conclusion that she did not notify Flynn of a date certain for her return to work at NUMC until July 22, 2021—two days after Bailey was hired and one day after Flynn announced that hire to the department, as Dikranis asserts in her Rule 56.1 Counterstatement. (Dikranis Tr. at 102–103; ECF No. 30-52.) Moreover, Dikranis' declaration affirms, rather than refutes, the fact that Flynn

cited Dikranis' medical leave as a reason for NUMC's failure to promote her in June or July 2021. (Dikranis Decl. ¶ 13.)

Fourth, Dikranis invokes a series of Flynn's remarks and actions to argue that NUMC's decision to hire Bailey for the full-time role in July 2021 after having informed Dikranis in May 2021 that the position was hers was motivated, at least in part, by discriminatory intent. None are sufficient to raise a genuine dispute of material fact as to whether Dikranis' promotion did not go through in June or July 2021 because she had not completed the required paperwork and was on medical leave from June 16, 2021 through July 28, 2021, and that she did not even have a confirmed return date until July 22, 2021. Nor are they sufficient to show that NUMC's decision not to promote Dikranis in June or July 2021 was motivated even in part by discriminatory intent. Indeed, many of Dikranis' factual assertions are entirely unsupported by the factual record. The Court addresses each of the remarks and actions that Dikranis attributes to Flynn.

First, Dikranis asserts that Flynn "[o]ffer[ed] a full-time position to Plaintiff in April 2021 only after it was declined by a less experienced childless employee, ignoring Plaintiff's many requests for an update, then interviewing others for the position." (Opp'n at 21.) The undisputed facts show, however, that this alleged conduct occurred *before* Flynn learned in May 2021 that Dikranis was pregnant. (Dikranis Tr. at 144–45.) Thus, the fact that Flynn offered the role to another employee who did not have children before offering it to Dikranis does not raise a material question of fact as to whether the failure to promote Dikranis in June or July 2021 was motivated by an intent to discriminate on the basis of her pregnancy, experience of childbirth, or a related medical condition.

Second, Dikranis argues that NUMC's failure to promote her to a full-time role in June or July 2021 was motivated in part by discriminatory animus, relying on her own testimony and

attestations by affidavit that when she informed Flynn of her pregnancy on May 26, 2021, Flynn "[a]ppear[ed] shocked and abruptly end[ed]" the conversation, and later questioned Dikranis' ability to work full-time with three children. (Opp'n at 21.) According to Dikranis, on the following day, May 27, 2021, Flynn made a series of comments including: "[T]hree kids is a lot . . . I myself have three children" and "[F]ull-time is a big commitment," and asked Dikranis, "[D]id you know you were pregnant when you accepted the job?" (Dikranis Tr. at 145.) Flynn also asked Dikranis, "Who is going to take care of the new baby?" and "How much time are you going to take on maternity leave?" (*Id.*) She also told Dikranis, "[W]ell, I guess if you want the job it's yours." (Dikranis Tr. at 145–47.)

These comments and questions must be considered in light of the record as a whole, viewed in the light most favorable to Dikranis, which includes the following facts. NUMC *did* offer Dikranis the full-time position in light of Flynn's statement to Dikranis on May 27, 2021, that "if you want the job it's yours." (*Id*. at 147.) Just a few days before the May 27, 2021 meeting, on May 24, 2021, Flynn had followed up with Bowen to confirm that Dikranis could be converted from part-time to full time and wrote, "Please let me know about this. I don't want to lose this employee." (ECF No. 30-11.) Two weeks later, on June 11, 2021—after Flynn had learned that Dikranis was pregnant—Baum confirmed to Bowen that Dikranis' position was ready to be converted to full-time and that Baum "just need[ed] a start date" and for Dikranis to "stop in to see [her]." (ECF No. 30-12.) As explained by Bowen, Dikranis needed to "do paperwork to resign the part-time title to accept the full-time title." (Bowen Tr. at 31.) Dikranis did not take these steps before going on medical leave on June 16, 2021, and was on medical leave from June 16, 2021 through July 28, 2021—and did not even have a confirmed return date until July 22, 2021. Viewing the entire record in the light most favorable to Dikranis, Flynn's

comments do not raise a genuine dispute of material fact as to discriminatory intent because NUMC and Flynn made efforts to convert Dikranis from a part-time to full-time position and offered her the promotion on May 27, 2021, even after Flynn's comments and questions, and because Dikranis did not complete the required paperwork, was on medical leave without a return-to-work date until July 22, 2021, and ultimately did not return to work until July 28, 2021.

Third, Dikranis argues that Flynn was motivated by discriminatory animus because Flynn "[d]iscuss[ed] a new full-time position at a department meeting, despite having already offered the position to Plaintiff . . . " (Opp'n at 21.) Dikranis appears to argue that Flynn's failure to disclose at a June 10, 2021 department meeting that Dikranis had been hired to the full-time position raises a question of fact as to whether Flynn and NUMC never intended to hire her to the full-time position. Dikranis relies on her own affidavit, where she attests that "[a]fter the meeting, Flynn told me she was still waiting to hear from HR about the position and would keep me posted." (Dikranis Decl. ¶ 7.) Even accepting this fact as true, on June 11, 2021, one day after the department meeting at issue, NUMC confirmed that Dikranis could be converted from a part-time to full-time role after she met with Rochelle Baum of Human Resourcese and completed necessary paperwork. (ECF No. 30-12.) Thus, Flynn's announcement of a full-time occupational therapist position at a June 10, 2021 department meeting comports with facts in the record showing that on June 10, 2021, Flynn was waiting for Human Resources to confirm that the full-time occupational therapist role could be filled by converting Dikranis' position rather canvassing the Civil Service list. (Dikranis Tr. at 88; Dikranis Decl. ¶ 7.) It does not raise a genuine dispute of material fact as to whether the failure to promote Dikranis in June or July 2021 was motivated in part by discriminatory intent.

Fourth, Dikranis argues that Flynn "further express[ed] negativity about [Dikranis'] pregnancy and suggest[ed] that she would not return after having her baby," relying on paragraph 37 of her Rule 56.1 Counterstatement in support. (Opp'n at 21; *see* Pl.'s 56.1 Resp. ¶ 37.) However, nothing in paragraph 37 or any of the exhibits on which it relies show that Flynn ever made a remark suggesting that Dikranis should not return to NUMC after her second parental leave. (*See* Pl.'s 56.1 Resp. ¶ 37; Dikranis Decl. ¶ 7.)[11] Nor does paragraph 37 or the evidence on which it relies identify any statements or questions by Flynn other than those already discussed above. Dikranis' arguments on this score amount to "[m]ere conclusory allegations or denials" that "cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks*, 593 F.3d at 166.

Fifth, Dikranis argues that Flynn was motivated by discriminatory animus in that she "[r]efus[ed] to permit Plaintiff to return to work with restrictions on June 30, 2021, despite allowing others to do so . . . then saying that it would be pointless for Sarah to return until after her pregnancy." (Opp'n at 22.) As discussed further below, Dikranis fails to point to any evidence in the record raising a genuine dispute about whether any other employee was afforded an accommodation to work as an occupational therapist subject to a lifting restriction, much less

[11] Dikranis relies only on paragraph 7 of her affidavit to assert that Flynn expressed negativity about her pregnancy and suggested that she "would not return after having a baby." (Opp'n at 21.) However, paragraph 7 provides no such support. Rather, it states:

> On June 10, 2021, during a department meeting, Flynn announced a full-time position had been approved, but failed to mention she had already offered the position to me, and that I had gladly accepted. After the meeting, Flynn told me she was still waiting to hear from HR about the position and would keep me posted.

(Dikranis Decl. ¶ 7.) Nothing in paragraph 7 supports Dikranis' assertion that Flynn "expressed negativity" about Dikranis' pregnancy or suggested that Dikranis would not return to work after her anticipated maternity leave.

a restriction to lift no more than 30 pounds. *See* Discussion Section I.B.i.2–3 *infra*. Her own affidavit attesting that three individuals were provided such an accommodation without any specifics about the jobs performed by these individuals or what accommodations were provided to them is insufficient. *See id*. Furthermore, Dikranis' assertion that Flynn stated it would be "pointless for Sarah to return" from medical leave taken following the car accident "until after her pregnancy" is based solely on the following vague attestation of her coworker, Jessica Schelin:

> While I do not recall the exact content of [Flynn's] discussion, or specifically who was present for this discussion, it is my recollection that Flynn (speaking to myself and a group of my coworkers) expressed frustration and negativity regarding Sarah's upcoming maternity leave, including the idea that Sarah hoped to return to work as a full-time Level I Occupational Therapist and then take maternity leave soon after.

(Schelin Decl. ¶ 9.) That Flynn expressed "frustration and negativity" regarding the temporal proximity of Dikranis' second maternity leave and her promotion does not raise a question of fact as to whether NUMC's failure to promote her was motivated in part by an intent to discriminate on the basis of pregnancy, childbirth, or a related medical condition, because NUMC did in fact promote Dikranis to a full-time position in which Dikranis worked for just four days before going on maternity leave in September 2021. Dikranis' argument that Flynn "[told] Plaintiff that she could not accept a full-time position, then go out on FMLA leave for a pregnancy in October" fails for the same reason. (Opp'n at 22.)

Accordingly, Dikranis has failed to point to any evidence that creates a genuine dispute of material fact as to whether NUMC's failure to promote her in June or July 2021 was motivated by an intent to discriminate or was based on pretextual reasons. NUMC is therefore granted summary judgment on Dikranis' Title VII claim that NUMC engaged in disparate

treatment on the basis of pregnancy, childbirth, or a related medical condition in failing to promote her to a full-time position in June or July 2021.

***ii. Termination of Employment Claim***

Dikranis also contends that NUMC subjected her to disparate treatment on the basis of her pregnancy, childbirth, or a related condition by terminating her employment as a full-time occupational therapist on December 20, 2021. NUMC has shown that it had a legitimate, nondiscriminatory reason for the action, specifically, Dikranis' failure to return to work by December 16, 2021, after her parental leave had already concluded on December 6, 2021, and after she was provided a letter warning that failure to return by December 16, 2021 would lead to the termination of her employment. Dikranis has failed to point to any evidence raising a genuine dispute of material fact as to whether she was terminated because of her pregnancy, childbirth, or a related medical condition or whether NUMC's asserted reason was pretextual.

*1. NUMC's Legitimate, Nondiscriminatory Reason*

The undisputed facts show the following: (1) on September 9, 2021, Dikranis was approved to take maternity leave from September 30, 2021 until December 6, 2021 (Sept. 9, 2021 Non-FMLA Medical Leave Approval Form, ECF No. 30-16); (2) Dikranis failed to return to work on December 6, 2021 (Dec. 9, 2021 Letter, ECF No. 30-24); (3) Dikranis received a December 9, 2021 letter from NUMC warning her that failure to return to work by December 16, 2021 would result in the termination of her employment (*id.*); (4) Dikranis did not return to work at NUMC on December 16, 2021 (Dec. 20, 2021 Letter; ECF No. 30-25), and (5) NUMC terminated her employment on December 20, 2021 (*id.*). NUMC has thus satisfied its burden of showing that it terminated Dikranis for the legitimate, nondiscriminatory reason that she first failed to return to work on December 6, 2021, which was the conclusion of her maternity leave,

and then failed to return to work by December 16, 2021 after being warned that such a failure would result in the termination of her employment.

Dikranis contends that December 6, 2021 was never an agreed-upon date for her return to work following maternity leave. (Pl.'s 56.1 Resp. ¶ 80.) However, she concedes that her own exhibit, a Medical Leave Approval Form, shows that the document approving her request for maternity leave provided a December 6, 2021 return date. (*See* Sept. 9, 2021 Non-FMLA Medical Leave Approval Form, ECF No. 30-40.) Dikranis maintains that she relied upon Dragotti's assurance that after the commencement of maternity leave, she "could then *apply* for childcare leave to extend her return date through the end of February." (Opp'n at 6 (citing Dikranis Decl. ¶ 15) (emphasis added).) However, Dikranis fails to raise a genuine dispute of material fact as to whether she was even entitled to childcare leave because, at the time of her request, she had not worked as a full-time NUMC employee for more than one year. (Dec. 2, 2021 Letter, ECF No. 30-23; NUMC Leave of Absence Policy, ECF No. 30-17; CBA, ECF No. 30-18.) Moreover, Dikranis acknowledges that she never received approval—whether before starting maternity leave or while on maternity leave—to return to NUMC at a date later than December 6, 2021.[12] On December 2, 2021, Dikranis texted Flynn: "[A]fter a discussion with my husband we feel it would be advantageous to request more time off for maternity leave. I have been in contact with Cathy from HR and *have submitted* the necessary paperwork for my request. I anticipate my date of return to be 2/28." (ECF No. 30-66 (emphasis added).) Thus, Dikranis' own text message to Flynn just days before Dikranis was scheduled to return to work

[12] (*See* Pl.'s 56.1 Resp. ¶ 16 ("She was initially cleared for leave through December 6 (presumably later changed to December 9), but on December 2, she emailed Cathy Dragotti . . . concerning her request for more time off and advised her that she was going to discuss this request with Flynn.").)

indicates that Dikranis had requested to return to NUMC at some point beyond December 6, 2021, but had not received approval.

Therefore, the record provides ample support for NUMC's assertion that it terminated Dikranis' employment for failure to return to work by December 16, 2021 in compliance with their Leave of Absence policy and not because of Dikranis' pregnancy, childbirth, or a related medical condition.

*2. Pretext and Discriminatory Motive*

In support of her argument that NUMC's reason for terminating her employment was pretextual, Dikranis asserts that her replacement did not commence work until March 2022, which was after Dikranis' desired return-to-work date of February 28, 2022. (Opp'n at 18.) Dikranis contends, "There was no reason NUMC could not have extended her leave or permitted her to return." (*Id.*)

However, Dikranis has not pointed to any evidence in the record showing that NUMC terminated Dikranis' employment because they needed to hire a replacement to take over her responsibilities immediately. Rather, NUMC asserts that they terminated her employment for her failure to return to work by December 16, 2021 in compliance with its Leave of Absence Policy, which provides, in pertinent part:

> All leaves of absence are subject to the approval of the Human Resources Department. Employees who fail to follow procedures to request a leave of absence and to ensure their request is approved, may be marked 'absent/no pay' and/or subject to further discipline up to, and including, termination.

(ECF No. 30-17 at 2.) Here, Dikranis has not marshaled any evidence raising a genuine dispute of material fact as to whether this policy was applied to her. Nor does she point to evidence showing the existence of a material factual dispute as to whether NUMC approved her request to

add childcare leave to her maternity leave so that she could return to work sometime after December 6, 2021.

Accordingly, NUMC is granted summary judgment on Dikranis' Title VII claim that NUMC subjected her to disparate treatment on the basis of her pregnancy, childbirth, or a related medical condition when it terminated her employment on December 20, 2021.

### B. Disparate Treatment Claims Based on a Failure-to-Accommodate Theory

In addition to her failure-to-promote and termination claims, Dikranis also advances two disparate treatment claims on a failure-to-accommodate theory. First, she brings a claim against NUMC for failing to grant her request for an accommodation to return from medical leave with a restriction to lift no more than 30 pounds. Second, she claims that NUMC's denial of her request for childcare leave constitutes disparate treatment on a failure-to-accommodate theory. (Opp'n at 10–11.)

"[A] plaintiff alleging that the denial of an accommodation constituted disparate treatment under [the PDA] may make out a prima facie case by showing, as in *McDonnell Douglas*, that she belongs to the protected class, that she sought accommodation, that the employer did not accommodate her, and that the employer did accommodate others 'similar in their ability or inability to work.'" *Young*, 575 U.S. at 229.

Here, Dikranis' disparate treatment claims based on a failure-to-accommodate theory do not survive summary judgment. Dikranis fails to raise a genuine dispute of material fact as to whether NUMC provided the requested accommodations—permission to return to work as an occupational therapist subject to a 30-pound lifting restriction and permission to extend maternity leave for childcare purposes—to others "similar [to Dikranis] in their ability or inability to work," as required to satisfy the fourth element of the prima facie case for disparate

treatment based on an alleged failure to accommodate. *Young*, 575 U.S. 529. Nevertheless, even assuming that she has met her burden at the prima facie stage, NUMC has articulated legitimate, non-discriminatory reasons for each decision, specifically that Dikranis could not perform essential job duties with the 30-pound lifting restriction and that Dikranis was denied a request for childcare leave as an extension of maternity leave because she lacked the required one year of employment as a full-time occupational therapist. In the face of these reasons, Dikranis fails to point to any evidence in the record raising a genuine dispute of material fact.

***i. Denial of Request to Work with a 30-Pound Lifting Restriction***

Dikranis claims that NUMC subjected her to disparate treatment by denying her a requested accommodation of returning to work from medical leave following a car accident on "light duty," with a restriction to lift no more than 30 pounds. (Opp'n at 10.) This claim fails at the prima facie stage. However, even assuming that Dikranis has made out a prima facie case of disparate treatment on a failure-to-accommodate theory, NUMC has shown that it had a legitimate, non-discriminatory reason for denying the requested accommodation—the fact that Dikranis' job responsibilities required her to be cleared to return to work with no lifting restrictions. Dikranis fails to introduce evidence raising a material question of fact as to whether this reason was pretextual or whether the denial was motivated in part by an intent to discriminate on the basis of pregnancy, childbirth, or a related medical condition.

*1. Prima Facie Case*

Dikranis fails to raise a material question of fact as to whether she can make out a prima facie case that the denial of her light duty request was disparate treatment on the basis of pregnancy, childbirth, or a related medical condition. The first three elements of the prima facie case are met. It is undisputed that Dikranis belonged to a protected class at the time she sought to

return to work—she was pregnant and had already disclosed the pregnancy to Flynn. (Dikranis Tr. at 145.) Dikranis has also at least raised a material question of fact as to whether she requested permission to return to work on light duty. Dikranis provided Flynn with a doctor's note permitting her to return to work on June 30, 2021, with a lifting restriction of 30 pounds. (ECF No. 30-51; *see also* Pl.'s 56.1 Resp. ¶ 44; Dikranis Tr. at 79–81.) Although Dikranis does not point to evidence specifically showing that she asked Flynn or anyone at NUMC to permit her to return to work with the 30-pound lifting restriction, viewing the record in the light most favorable to her, there is a material question of fact as to whether her transmission of the doctor's note to Flynn constituted a request to return to work with the accommodation that she not be required to lift more than 30 pounds. Finally, there is no dispute that to the extent Dikranis made a request to return from medical leave with a 30-pound lifting restriction, NUMC denied that request through Flynn's communication to Dikranis that she could not return to work until she received medical clearance with no restrictions. (Pl.'s 56.1 Resp. ¶ 45.)

However, Dikranis' claim fails at the fourth prong because she does not identify any evidence showing that NUMC "did accommodate others 'similar in their ability or inability to work.'" *Young*, 575 U.S. at 229. As explained in detail below, while Dikranis asserts that four other NUMC employees were afforded light duty accommodations, she fails to point to evidence demonstrating that any of the employees at issue were "similar [to her] in their ability or inability to work." *Id*.

*2. NUMC's Legitimate, Nondiscriminatory Reason*

NUMC asserts that Dikranis was not permitted to return from medical leave until she received clearance from her doctor to return with no lifting restrictions in light of her job responsibilities, which require lifting patients such that the therapist is lifting more than 30

pounds. (Mot. at 4; Def. 56.1 Statement ¶ 18.) The record supports the legitimacy of this proffered reason for denying Dikranis' accommodation request. First, Dikranis herself explained in deposition that "some of the patients we lift are very heavy, they require full-max [assistance]" which can require up to "75% of their body weight they're unable to support on their own." (Dikranis Tr. at 80.) She continued, "Obviously 30 pounds doesn't cut it," referring to the lifting restriction imposed by her doctor. (*Id.*) Dikranis further explained that NUMC has "an outpatient rehab department which does not require lifting," and that she was "hoping to get moved to that spot" so that she could return to work on June 30, 2021. (*Id.* at 80–81.) Thus, Dikranis admits that her request for an accommodation amounted to a request to work in a different role or department than the one to which she was assigned or to otherwise be excused from performing an essential job duty to treat patients, where treatment would require her to lift more than 30 pounds.

Accordingly, NUMC has articulated a legitimate, nondiscriminatory reason for denying Dikranis' request for an accommodation to return to work from medical leave with a 30-pound lifting restriction. *Baker v. Bridge Inc.*, 805 F. Supp. 3d 521, 542 (S.D.N.Y. 2025) ("[U]nwillingness to comply with the requirements of her position amounts to a legitimate, nondiscriminatory reason . . . ."); *Shkolnikova v. DeJoy*, No. 18-cv-6400, 2022 WL 3358077, at *14 (E.D.N.Y. Aug. 15, 2022) (defendant satisfied burden of demonstrating legitimate, nondiscriminatory reason where it showed that "it could not provide any accommodation that would enable Plaintiff to provide the essential functions of her . . . position without creating a job that did not exist or violating the relevant collective bargaining agreement").

*3. Pretext and Discriminatory Motive*

Dikranis bears the burden of identifying evidence that raises a genuine dispute of material fact as to whether NUMC's proffered reason for denying her request for permission to return to work with a 30-pound lifting restriction was pretextual or that the denial "was motivated at least in part by" Dikranis' pregnancy, childbirth, or a related medical condition. *Bart*, 96 F.4th at 576. Dikranis has failed to satisfy this burden.

Dikranis contends that "other employees were given accommodation and moved to different assignments for reasonable periods of time (such as bedside) so as not to have to lift" and identifies Carol Chamoff, Keisha Green, Nicole Simmons, and Lisa Umstead as examples. (Pl.'s 56.1 Resp. ¶ 18.) However, she fails to show that NUMC granted any of these individuals an accommodation to work as an occupational therapist with a lifting restriction.

As an initial matter, the only evidence Dikranis provides in support of her assertion that these four individuals were granted accommodations akin to what she was denied is insufficient to substantiate her claims. Dikranis relies exclusively on three text messages set forth in exhibits to her declaration. (*See* Dikranis Decl. ¶ 25; ECF Nos. 30-42 to 30-44.) However, construing the record in the light most favorable to Dikranis and drawing all inferences in her favor, the text messages at issue do not raise a genuine dispute of material fact as to whether any of the four individuals identified by Dikranis were "similar in their ability or inability to work" and were granted an accommodation like the one Dikranis was denied. (*See* Pl.'s 56.1 Resp. ¶ 18.)

First, Dikranis relies on Exhibit 8, which contains an undated text conversation between Dikranis and a contact listed as "Dena Numc," who Dikranis attests is Dena Adler Gilbert. (ECF No. 30-42 at 10.) An undated text from Dikranis to Gilbert reads, "I mean they moved Lisa because of her feet, they moved Keisha because of her sx [sic], I can see bedside people I just

have to be careful . . . ." (ECF No. 30-42.) She also cites Exhibit 9, which is an undated text conversation between Dikranis and an unnamed individual, who Dikranis identifies as Gilbert, who writes to Dikranis, "Carol is going around telling everyone that she is here on light duty and cannot touch a patient."[13] (ECF No. 30-43.) The final exhibit, Exhibit 10, consists of an undated text conversation between Dikranis and another unnamed individual, who Dikranis attests is "Keisha," presumably referring to Keisha Green. (ECF No. 30-44; ECF No. 30-32 at 10.) Keisha writes to Dikranis, "Nicole keisha and carol have been on light duty now[.]" (ECF No. 30-44.) None of these text messages raise a genuine dispute of material fact as to whether NUMC granted Chamoff, Green, Simmons, or Umstead permission to work with a lifting restriction, such as the 30-pound restriction for which Dikranis sought clearance. Moreover, no evidence in the record addresses whether Chamoff, Green, Simmons, and Umstead were granted such accommodations while working as occupational therapists, or how long any such accommodation was provided. Rather, the record shows that at least Umstead was an "OT aid," "not a treating clinician," which suggests that she had different job responsibilities than Dikranis, and Dikranis does not point to evidence raising a question of material fact on this issue. (Flynn Tr. at 31–32, 55.) Similarly, although Dikranis testified that Carol Chamoff was an occupational therapist, Flynn explained that her job *did* involve lifting people, and accordingly, she was not permitted to return with lifting restrictions. (Dikranis Tr. at 146; Flynn Tr. at 56–57.)[14] The

[13] The Court notes that this statement contains inadmissible hearsay. *See Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment, and a district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence.").

[14] (*See* Flynn Tr. at 56 (Q. "Do you recall her . . . being permitted to avoid lifting for a period of time?" // A. "No. No employee comes back to work, again, without restrictions. Now, the staff

record does not establish what Green and Simmons' responsibilities were or what accommodations they were given.

Furthermore, Dikranis fails to introduce *any* evidence raising a genuine dispute of material fact as to whether any of these employees were not pregnant at the time they were purportedly permitted to work as occupational therapists while being subject to a restriction similar to a 30-pound lifting restriction. Accordingly, she fails to show that there is any genuine factual dispute as to whether NUMC's denial of her request for an accommodation was motivated in part by an intent to discriminate on the basis of pregnancy, childbirth, or a related medical condition.

In *Young v. United Parcel Service*, 575 U.S. 206 (2015), the Supreme Court considered a similar disparate treatment claim concerning the denial of a requested pregnancy accommodation, specifically, permission to return to work with a lifting limitation. In that case, however, the plaintiff had shown that her employer, UPS, "had a light-duty-for-injury policy with respect to numerous 'other persons,' but not with respect to pregnant workers." 575 U.S. at 216. The Supreme Court reversed the Fourth Circuit's affirmation of summary judgment because:

> [t]he plaintiff can create a genuine issue of material fact as to whether a significant burden exists by providing evidence that the employer accommodates a large percentage of nonpregnant workers while failing to accommodate a large percentage of pregnant workers. Here, for example, if the facts are as [plaintiff] says they are, she can show that UPS accommodates most nonpregnant employees with lifting limitations while categorically failing to accommodate pregnant employees with lifting limitations. [Plaintiff] might also add that the fact that UPS has multiple policies that accommodate nonpregnant employees with lifting restrictions suggests that its reasons for failing to accommodate pregnant employees with lifting restrictions are not sufficiently strong—to

will help each other out. I have some therapists -- I have a therapist who's 4 foot 10 who works side by side with a guy who's 6 foot 4. He obviously will help her transport people.").)

> the point that a jury could find that its reasons for failing to accommodate pregnant employees give rise to an inference of intentional discrimination.

*Id*. at 229–30. Similarly, in *Legg v. Ulster County*, the Second Circuit held that a plaintiff satisfied her burden to produce evidence sufficient to convince a reasonable jury that the employer's reasons for denying a requested pregnancy accommodation were pretextual in light of undisputed evidence that the employer "declin[ed] to extend light duty accommodations to pregnant employees" while providing it to other employees. 820 F.3d 67, 75 (2d Cir. 2016). The Second Circuit thus held that "[a] reasonable jury could conclude that the defendants imposed a significant burden on pregnant employees because, like UPS, the County categorically denied light duty accommodations to pregnant women." *Id*.

Here the evidence on which Dikranis seeks to rely is entirely vague and non-specific. Dikranis fails to point to evidence that Chamoff, Green, Simmons, and Umstead were occupational therapists with the same responsibilities as her or that NUMC granted each of them permission to work as occupational therapists while subject to a lifting restriction, such as a restriction to lift no more than 30 pounds. As a result, Dikranis has failed to raise a genuine dispute of material fact as to whether the denial of her June 25, 2021 request to return to work with a 30-pound lifting restriction was motivated in part by an intent to discriminate on the basis of pregnancy, childbirth, or a related medical condition as opposed to the fact that such a restriction prevented her from carrying out the essential functions of her job as an occupational therapist. *See Moses*, 913 F.3d at 305 (holding that the non-moving party "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment").

Accordingly, NUMC is granted summary judgment on Dikranis' Title VII claim that NUMC engaged in disparate treatment by denying her request for permission to return from medical leave to work on June 30, 2021, with the restriction to lift no more than 30 pounds.

***ii. Denial of Request for Extended Maternity Leave***

Dikranis contends that NUMC engaged in disparate treatment by denying her December 2, 2021 request for childcare leave, which would have extended her maternity leave from ending on December 6, 2021, by adding childcare leave that would end on February 28, 2022. Assuming that Dikranis has satisfied her burden of establishing a prima facie case, NUMC has articulated a legitimate, nondiscriminatory reason for denying the request—specifically, Dikranis' ineligibility for childcare leave in light of the fact that she had worked less than one year in a full-time role. Dikranis fails to point to evidence raising a genuine dispute of material fact as to whether NUMC's denial of her request was motivated in part by discriminatory intent.

*1. Prima Facie Case*

The record establishes the first three elements of the prima facie case. It is undisputed that Dikranis was on maternity leave when she requested childcare leave and therefore is protected from discrimination "because of . . . childbirth" under the Pregnancy Discrimination Act. (ECF No. 30-22; Dikranis Tr. at 142–43.) It is also undisputed that on December 2, 2021, Dikranis requested an accommodation by submitting a childcare leave form to NUMC HR and by texting Flynn to report that she had made that request. (ECF Nos. 30-22, 30-66.) It is also undisputed that NUMC denied Dikranis childcare leave. However, Dikranis has not identified evidence raising a genuine dispute as to whether other similarly situated individuals were afforded a similar accommodation to the one that she was denied.

*2. NUMC's Legitimate, Nondiscriminatory Reason*

NUMC contends that it denied Dikranis' request for childcare leave because it neutrally applied its childcare leave policy, under which employees are only eligible for childcare leave after one year of service as a full-time employee. (Mot. at 7.) It is undisputed that, when Dikranis submitted her childcare leave request on December 2, 2021, she had only been working full-time for around five weeks, since September 26, 2021.

The undisputed evidence in the record substantiates the existence of a NUMC policy by which employees are only eligible for childcare leave after more than one year of full-time service. NUMC provides a Human Resources Leave of Absence Policy guide, which features a sub-section labeled "Child Care Leave in accordance with Collective Bargaining Agreement." (ECF No. 30-17.) It provides: "*Upon completion of one year of service* full time employees are eligible for Child Care Leave. (ECF No. 30-17 at 4 (emphasis added).) It further provides, "Employees with *less than one year of actual completed service* are *not eligible* for the one year leave of absence." (*Id*. (emphasis added).)

Dikranis disputes that NUMC's childcare leave policy applied to her childcare leave request because the policy's effective date is November 1, 2021. (*See id*.; Pl.'s 56.1 Resp. ¶ 74.) However, Dikranis does not dispute that she submitted her request for childcare leave on December 2, 2021, which was around one month *after* the NUMC childcare leave policy went into effect. (ECF Nos. 30-17, 30-22, 30-66; Dikranis Tr. at 142–43.) Moreover, the childcare leave policy states that "[e]mployees are required to complete an 'Employee Request and Authorization for Leave' form in Human Resources prior to the commencement of their leave. The request for the child care leave must be accompanied by medical documentation from an appropriate physician (pediatrician, delivering OB/GYN, etc.)." (ECF No. 30-17 at 4.) It is

undisputed that Dikranis did not submit such a form until after her maternity leave had commenced, which further supports NUMC's argument that she was not approved for childcare leave. Rather, on December 2, 2021—just days before Dikranis was scheduled to return to work—Dikranis texted Flynn, "[A]fter a discussion with my husband we feel it would be advantageous to request more time off for maternity leave. I have been in contact with Cathy from HR and have submitted the necessary paperwork for my request. I anticipate my date of return to be 2/28." (ECF No. 30-66.) Dikranis' use of the word "anticipate" indicates that as of December 2, 2021, she had requested but had not yet been approved to extend her leave from December 6, 2021, to February 28, 2022.

The record also includes the Collective Bargaining Agreement between NUMC and the Civil Service Employees Association – Nassau Local 830 (the "CBA"), which is referenced in the Human Resources Leave of Absence Policy guide. (ECF No. 30-18.) In a section entitled "Child Care Leave," the CBA provides, "No employee shall be eligible for Child Care Leave until after the completion of one full year of actual completed service." (*Id.* at 49–50.) Separately, Section 44 of the CBA is titled "Exclusive Benefits for Certain Employees Working Less Than Full-Time" and includes a subsection regarding part-time employees hired on or after April 1, 1985. (*Id.* at 50, 53.) Section 44 provides:

> 44-5.1. Part time employees shall not receive any time and leave benefits until such time as they have completed one thousand . . . hours of employment with NHCC. They shall, however, receive the benefits of Section 44-4.2, except they shall not receive supplemental leave at half-pay.
>
> 44-5.2. After completing one thousand . . . hours of employment with NHCC, employees shall receive the vacation leave benefits of Section 42-2, and the pro-rated sick leave benefits of Section 42-5.

(*Id.* at 53.) The above-referenced sections and Sections 44-4.2, 42-2, and 42-5 outline specific leave benefits including vacation, sick, and bereavement leave, but contain no reference to

childcare leave. (*Id*. at 41, 42–43, 56–57.) Under the terms of the CBA and Leave of Absence Policy guide, Dikranis was not eligible for childcare leave at the time of her December 2, 2021 request because she had not worked for NUMC as a full-time employee for one full year.

Dikranis disputes NUMC's asserted non-discriminatory reason for the denial of her childcare leave request by asserting that the CBA does not specify that the "one year of actual completed service" requires one year of full-time service specifically, as opposed to one year of service at NUMC generally. (Opp'n at 17–18.) Dikranis relies only on Cathy Dragotti's deposition testimony for this interpretation of the CBA. (Pl.'s 56.1 Resp. ¶ 75.) Dragotti testified that "CSEA guidelines, which is our union, allows the employee to be out up to one full year for child care purposes. But in order to qualify for that, *you have to have one full year of employment*." (Dragotti Tr. at 7.) However, Dikranis ignores that in that same deposition, Dragotti clarified several times that Dikranis' interpretation of the childcare leave policy was incorrect:

> Q. I'm going to show you Exhibit 12. Do you recognize what this document is?
> A. That's the application for child care leave, which, as you could see, I stamped it December 2nd. I got it from -- Sarah signed it December 2nd, so the day I received this I responded that she was not approved for leave, **that she did not have the year of service.**
>
> ***
>
> Q. Now, the language of this subsection [of the CBA] says, "No employee shall be eligible for child care leave until after the completion of one full year of actual completed service," correct?
> A. Yes.
> Q. And your denial letter didn't use that language. Your denial said to be eligible, you must have completed one full year of full-time service. Do you see that?
> A. Yes.
> Q. Do you see how you added words that don't exist in the policy?
> A. *But it's the same exact sentence though.*
> Q. So you believe that the word "one full year of actual completed service" is the same sentence as, "Completed one full year of full-time service"?
> A. Yes. *That's how we administer the policy.*

(Dragotti Tr. at 37–39 (emphasis added).) Thus, NUMC has provided sufficient support for its assertion that it had a legitimate, nondiscriminatory reason for denying Dikranis' request to extend maternity leave with childcare leave, specifically that Dikranis was ineligible for childcare leave under NUMC policy and the terms of the relevant CBA.

*3. Pretext and Discriminatory Motive*

Dikranis asserts that NUMC could have granted her childcare leave or otherwise permitted an extension of her maternity leave because it has done so for other employees in the past. (Opp'n at 11.) None of the evidence on which she relies raises a genuine dispute of material fact as to whether NUMC's reason for denying her childcare leave was pretextual or otherwise motivated in part by an intent to discriminate based on pregnancy, childbirth, or a related medical condition.

First, Dikranis relies on a paragraph in her own affidavit in which she attests as follows:

> Elizabeth Flynn granted Eileen Barbagallo, part-time occupational therapist, 11 months of leave following childbirth. Flynn also granted extended leaves to others, including Carol Chamoff, Eileen Barbagallo, Nicole Simmons, and Lynn Warkentin.

(Dikranis Decl. ¶ 21.) Dikranis' statement does not raise a genuine dispute of material fact as to pretext or whether pregnancy, childbirth, or a related medical condition was a motivating factor. With respect to Barbagallo, Dikranis fails to explain why NUMC's extension of leave to another pregnant worker creates a material question of fact as to whether NUMC denied her request for childcare leave at least in part because of her pregnancy, childbirth, or a related medical condition. Moreover, Dikranis does not point to evidence that raises a material question of fact as to whether Chamoff, Simmons, or Warkentin had not worked one year in a full-time role, but rather, had one year of work history that included part-time work. Nor does Dikranis provide any evidence raising a genuine question of material fact as to whether any of the four employees she

identified were granted *childcare leave*—the specific type of leave that Dikranis sought on December 2, 2021—as opposed to some other type of leave, such as medical leave. And she does not assert that she requested any other type of leave other than childcare leave, for which the undisputed facts show she was ineligible. Thus, Dikranis has not shown that any of the four individuals she identified were permitted childcare leave while she was denied such leave because of her pregnancy, childbirth or a related medical condition or that NUMC's asserted reason for the denial of her request—specifically, her ineligibility for childcare leave—was pretextual.

Dikranis also relies on the following statement in her affidavit:

> Dragotti told me that although I only qualified for non-FMLA leave, she had never heard of a supervisor not accepting back a willing employee following leave due to the staffing concerns of the hospital. She also told me that whether to allow me back to work after an extended leave would be at Flynn's discretion.

(Dikranis Decl. ¶ 22.) The Court declines to consider these statements, which constitute inadmissible hearsay. *See Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment, and a district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence."). Even if these statements were admissible, however, they do not support a genuine dispute of material fact as to pretext or the broader question of whether NUMC's denial of Dikranis' leave request was motivated in part by pregnancy, childbirth, or a related medical condition.

Lastly, Dikranis points to the fact that Flynn had granted her an additional four weeks of leave following the end of her first maternity leave at NUMC, which ultimately concluded on January 6, 2019. (Pl.'s 56.1 Resp. ¶ 93; Dikranis Tr. at 34–35.) Dikranis does not point to evidence in the record suggesting that the four-week extension was childcare leave. Moreover,

Dikranis does not explain how Flynn's grant of Dikranis' request for extended maternity leave in 2018—which followed Dikranis' pregnancy and childbirth—raises a genuine dispute of material fact as to whether NUMC's denial of her request for childcare leave in 2021 was based on her pregnancy, childbirth, or a related medical condition.

Thus, NUMC is granted summary judgment on Dikranis' Title VII claim that NUMC engaged in disparate treatment by denying her request made on December 2, 2021, for childcare leave.

### C. <u>Retaliation Claims</u>

A plaintiff pursuing Title VII retaliation claims must first make out a prima facie case by "establish[ing] four elements: (1) 'an adverse employment action'; (2) 'participation in a protected activity'; (3) 'that the defendant knew of the protected activity'; and '(4) a causal connection between the protected activity and the adverse employment action.'" *Edelman*, 141 F.4th at 45. The plaintiff's burden at summary judgment is to point to evidence in the record raising a genuine issue of material fact with respect to each element of the prima facie case. *Id*. If the plaintiff meets that burden, the burden then shifts to the employer to articulate a legitimate, nonretaliatory reason for the adverse action. *Id*. If the employer does so, the plaintiff must point to evidence that raises a genuine dispute as to whether the employer's proffered reason was pretextual or that adverse action was because of an intent to retaliate against the plaintiff's protected activity. *Id*.

Dikranis' Title VII retaliation claims do not survive summary judgment because she fails to point to any evidence in the record raising a genuine dispute of fact as to the elements of a prima facie case of retaliation. Dikranis challenges as retaliatory the following adverse actions (1) NUMC's failure to promote her to the full-time occupational therapist position in June or

July 2021; (2) NUMC's denial of her request to return to work from medical leave with a 30-pound lifting restriction; (3) NUMC's denial of her December 2, 2021 request for permission to take childcare leave from December 7, 2021 through February 28, 2022; and (4) NUMC's termination of her employment on December 20, 2021. Each of these adverse actions satisfies the first element of a prima facie case of retaliation.

However, Dikranis fails to point to evidence in the record raising a genuine dispute of material fact as to whether she engaged in protected activity as required to meet the second element of a prima facie case of retaliation. The undisputed facts show she did not.

To determine whether an employee has engaged in "protected activity" to support a Title VII retaliation claim, the Second Circuit relies on the text of Title VII's antiretaliation provision. *See Newton v. LVMH Moet Hennessy Louis Vuitton Inc.*, ___ F.4th ___, No. 25-1697-cv, 2026 WL 2819692, at *7 (2d Cir. Sept. 21, 2026); *Littlejohn v. City of New York*, 795 F.3d 297 (2d Cir. 2015). Title VII prohibits an employer from retaliating against an employee "because [s]he has opposed any practice made an unlawful practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). Thus, the Second Circuit has interpreted Title VII's antiretaliation provision to "contain an 'opposition clause' and a 'participation clause.'" *Newton*, 2026 WL 2819692, at *6.

With respect to the opposition clause, "[a]n employee engages in 'opposition' to unlawful employment practices (and thus engages in protected activity) when she engages in 'any activity designed to resist or antagonize; to contend against; to confront; resist; or withstand discrimination.'" *Id.* at *7. Protected activities governed by the opposition clause include:

> 'making complaints to management' or 'protesting against discrimination by industry or by society in general.' Thus, 'when an employee communicates to her employer a belief

> that the employer has engaged in a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity.'

*Id*. Moreover, the Second Circuit has "made clear that the participation clause only encompasses participation in formal EEOC proceedings; it 'does not include participation in an internal employer investigation unrelated to a formal EEOC charge.'" *Littlejohn*, 795 F.3d at 316.

Here, Dikranis maintains that she engaged in protected activity by requesting and taking maternity leave. (*See* Opp'n at 9–10.) However, there is no evidence in the record that she actually engaged in any conduct opposing any practice made unlawful by Title VII. Neither requesting nor taking maternity leave constitutes opposition to conduct prohibited by Title VII. Nor is there any evidence in the record suggesting that Dikranis engaged in any other activity that could be characterized as opposition to an unlawful employment practice. Even when viewing the record in the light most favorable to Dikranis, it does not raise a genuine question of material fact as to whether Dikranis "communicate[d] to her employer a belief that the employer has engaged in a form of employment discrimination." *Newton*, 2026 WL 2819692, at *7. At best, Dikranis questioned Dragotti "about why Barbagallo was given 11 months off after childbirth but she could[n't] take leave only until February." (Pl.'s 56.1 Resp. ¶ 89.) However, given that Dikranis was questioning Dragotti about leave afforded to another pregnant employee, such a statement does not raise a material question as to whether Dikranis was complaining that she was being subjected to discrimination motivated in part by pregnancy, childbirth, or a related medical condition. As the Second Circuit has instructed, "in the Title VII context, to constitute protected activity, the employer must have 'understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII.'" *Newton*, 2026 WL 2819692, at *7.

Second, there is also no evidence in the record raising a genuine dispute of material fact as to whether Dikranis engaged in protected activity under the participation clause of Title VII's antiretaliation provision. Dikranis' request for and taking of maternity leave does not constitute participation in EEOC proceedings, and there is no dispute that Dikranis did not participate in formal EEOC proceedings until *after* NUMC terminated her employment. (*See* Pl.'s 56.1 Resp. ¶ 94 ("Undisputed that Sarah did not file or express any complaints until after she was fired.").) Because Dikranis' participation in EEOC proceedings took place *after* the latest in time alleged retaliatory action, the record supports no genuine dispute as to whether Dikranis engaged in protected activity as understood under the participation clause.

The caselaw upon which Dikranis relies to argue that she engaged in protected activity is unavailing. She first cites *Symotyuk-Knoll v. HealthEquity, Inc.*, for its finding on a motion to dismiss that "Plaintiff has properly established that she engaged in a protected activity by seeking pregnancy leave." 2023 WL 5576405, at *5 (S.D.N.Y. 2023); Opp'n at 9. However, what the plaintiff had done to "seek[] pregnancy leave" went beyond what Dikranis did here, such that the plaintiff's activities more reasonably fell within the scope of "protected activity." There, the court noted that plaintiff's protected activities "includes voicing her concerns about job security to Mr. Murdock due to the merger and her leave, informing Ms. Mathis she was worried that her time off requests would be refused, and her request for intermittent NYSPFL leave." 2023 WL 5576405, at *5. Thus, the district court concluded that the plaintiff's activities were understood to "communicat[e] to her employer a belief that the employer has engaged in a form of employment discrimination." *Newton*, 2026 WL 2819692, at *7. Moreover, the district court in *Symotyuk-Knoll* was assessing whether plaintiff's claims withstood a motion to dismiss—not a motion for summary judgment. 2023 WL 5576405, at *1.

Next, Dikranis cites *Spaulding v. New York City Department of Education*, which is inapposite here. 2015 WL 12645530 (E.D.N.Y. 2015); Opp'n at 9. There, the plaintiff had brought retaliation claims under the FMLA and the ADA. 2015 WL 12645530, at *41. The court found that submission of a written FMLA leave request constituted protected activity only within the context of an FMLA retaliation claim, in light of the fact that the FMLA "allows for 'verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave.'" *Id*. With respect to the plaintiff's ADA claim, however, the district court relied exclusively on the fact that plaintiff had made "a charge of discrimination with the EEOC" to find the "protected activity" element of her ADA claim satisfied. *Id*. *Spaulding* is thus clearly distinguishable from this case, where Dikranis voluntarily dismissed her FMLA retaliation claim and where it is undisputed that Dikranis only participated in EEOC proceedings that post-dated all four of the alleged retaliatory adverse actions.

Next, Dikranis relies on an out-of-circuit decision on a motion to dismiss, *Hannis-Miskar v. North Schuylkill School District*, for the proposition that taking pregnancy leave is a protected activity. 2016 WL 3965209 (M.D. Pa. 2016); Opp'n at 9–10. However, in that action, the plaintiff had not only taken pregnancy leave—the district court noted that plaintiff "properly pled" that she had "submitted [a] letter, which contained complaints of gender discrimination, pregnancy discrimination, and harassment . . . at which time she was four months pregnant," which plausibly alleged that she complained of conduct prohibited by Title VII. 2016 WL 3965209, at *6.

Finally, Dikranis relies on *Tolleson v. Unity Health Systems*, which held that taking maternity leave was not a protected activity but that "an employer nevertheless cannot take an adverse employment action against an employee for utilizing maternity leave, as such action is

analogous to taking action against her because of her pregnancy." 2012 WL 1834206, at *8 (W.D.N.Y. 2012); Opp'n at 9–10. However, the *Tolleson* court made this point to support its conclusion that "the appropriate claim is one for discrimination, not retaliation." 2012 WL 1834206, at *8. Therefore, "an employer who discharges a qualified employee merely because she takes maternity leave or pregnancy-related disability leave may be found liable for disparate treatment, but not retaliation." *Id*. This Court agrees, which is why it has provided a detailed analysis of Dikranis' claims that each of the four adverse actions that she challenges constituted disparate treatment because of her pregnancy, childbirth, or a related medical condition. *See* Discussion Section I.A–B *supra*.

Accordingly, summary judgment is granted to NUMC on Dikranis' Title VII claims for retaliation because the record does not support a genuine dispute of material fact as to whether she engaged in any protected activity as required to satisfy the second element of a prima facie case for retaliation.

## II. Section 1983 Claims

"The Fourteenth Amendment, as made actionable by 42 U.S.C. § 1983, 'provides public employees with the right to be 'free from discrimination.''" *Buon*, 65 F.4th at 78. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Id*. "A state employee acting in his official capacity is acting under color of state law." *Id*. "Once the color of law requirement is met, a plaintiff's equal protection claim parallels his Title VII claim, except that a [Section] 1983 claim, unlike a Title VII claim, can be brought against an individual." *Id*. However, "[a]n individual may be held

liable under [Sections] 1981 and 1983 only if that individual is 'personally involved in the alleged deprivation.'" *Littlejohn*, 795 F.3d at 314.

Dikranis brings Section 1983 claims against Flynn for gender discrimination and retaliation in violation of the Equal Protection Clause of the Fourteenth Amendment. As Dikranis correctly recognizes, "Discrimination and retaliation claims brought pursuant to § 1983 are subject to the same standards as Title VII." (Opp'n at 25.) Accordingly, the Second Circuit has recognized that when courts are analyzing Title VII and Section 1983 claims in tandem, "[t]he elements of one are generally the same as the elements of the other and the two must stand or fall together." *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004); *see also Gopal v. Univ. of Connecticut*, No. 25-1026-cv, 2026 WL 1970477, at *2 (2d Cir. July 8, 2026) (same).

Dikranis advances no independent arguments in support of her Section 1983 claims that are distinct from those in support of her Title VII claims. Thus, because NUMC is granted summary judgment on Dikranis' Title VII claims for disparate treatment (including those claims brought on a failure-to-accommodate theory) and retaliation, there is no genuine dispute of material fact as to whether Flynn is liable for disparate treatment or retaliation under Section 1983 and the Fourteenth Amendment Equal Protection Clause. *Hayut v. State Univ. of New York*, 352 F.3d 733, 754 (2d Cir. 2003) (dismissing Section 1983 claims against individual defendants upon "finding no Title IX liability as a matter of law"); *Haywood v. Annucci*, No. 18-cv-10913, 2022 WL 4357648, at *16 (S.D.N.Y. Sept. 20, 2022) ("Personal involvement in an alleged violation cannot exist where there is no alleged violation.").

**CONCLUSION**

For the reasons set forth above, summary judgment is granted to Defendant NUMC on Dikranis' Title VII discrimination and retaliation claims and to Defendant Flynn on Dikranis' Section 1983 discrimination and retaliation claims. The Clerk of Court is directed to enter Judgment and close the case.

Dated: Central Islip, New York
October 21, 2026

*/s/ Nusrat J. Choudhury*
NUSRAT J. CHOUDHURY
United States District Judge